Gerald HERRERA, Appellant,

v.

The STATE of Texas.

No. PD–1986–05.

Court of Criminal Appeals of Texas.

Nov. 21, 2007.

Alexander L. Calhoun, Austin, for Appellant.

Whitney S. Wiedeman, Asst. Crim. D.A., Lockhart, Jeffrey L. Van Horn, State's Attorney, Austin, for State.

## OPINION

KEASLER, J., delivered the opinion of the Court in which KELLER, P.J., and MEYERS, WOMACK, HERVEY, and COCHRAN, JJ., joined.

The court of appeals upheld the trial judge's determination that Gerald Herrera was not "in custody" for purposes of *Miranda v. Arizona*[1] when he was interviewed by Investigator Powell about a fight while he was in held in the county jail on an unrelated offense.[2] We agree and affirm.

## I. Factual and Procedural Background

In July 2001, Gerald Herrera and some members of his family were involved in an interracial fight with a group of African–Americans outside of the Mia Mar Bar in Lockhart, Texas. During the fight, several of the African–Americans were stabbed or cut.

Sergeant Tedford arrived at the scene shortly after the fight ended. Another officer immediately asked Sergeant Tedford to stop a red car that was leaving the scene. Sergeant Tedford stopped the car and identified the three occupants as Gerald Herrera and his parents, Maria and Natividad. Gerald was seated alone in the backseat of the car. While the Herreras were questioned by Tedford and another officer, Officer Garza conducted a search of the car and discovered a lock-blade knife in the backseat on the floorboard. Officer Garza arrested Gerald on an outstanding warrant and transported him to the Caldwell County Jail.

The next morning, Investigator Powell went to the jail to talk to Gerald about the fight. Investigator Powell did not give Gerald *Miranda*[3] warnings or advise of him of his statutory rights under Article 38.22, Section 2(a) of the Texas Code of

1. 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

2. *Herrera v. State*, No. 03–04–00766–CR, 2005 WL 3234413, at *3–4, 2005 Tex.App. LEXIS 10030, at *7–12 (Tex.App.-Austin Dec. 1, 2005) (not designated for publication).

3. 384 U.S. at 478–79, 86 S.Ct. 1602; *see also Dickerson v. United States*, 530 U.S. 428, 444, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000).

Criminal Procedure[4] before he spoke to him. Investigator Powell also failed to record the conversation.[5]

During the interview, Gerald told Investigator Powell "that he had a knife in his pocket, that, when he was stopped by the officers, that he took the knife out of his pocket and dropped it on the floorboard." Gerald also told Investigator Powell that he saw his brother fighting with some males and that he witnessed an African–American male hit his father. Explaining his involvement in the fight, Gerald told Investigator Powell that

> when he got to the street and somebody knocked his glasses off, that it knocked him down and that somebody, someone was kicking and hitting on him.... [H]e reached in his pocket to get his knife, but that every time he tried to reach in his pocket somebody would hit him or kick him, so he just curled up into a ball trying to protect himself.

Gerald was later charged with three counts of aggravated assault with a deadly weapon. Gerald elected to have a jury trial and entered pleas of not guilty. Before trial, Gerald had filed a motion to suppress the statements that he made to Investigator Powell. Although Gerald did not request a pretrial suppression hearing, during Investigator Powell's testimony at trial, Gerald, citing his motion to suppress, objected when Investigator Powell began to testify about his conversation with Gerald in the jail. The judge then excused the jury and allowed the parties to question Investigator Powell about the circumstances surrounding the interview.

When defense counsel asked Investigator Powell if Sergeant Tedford told him that the Herreras were suspects, Investigator Powell stated that Sergeant Tedford only told him that they had been involved in the fight. Defense counsel continued to inquire into Investigator Powell's conversation with Sergeant Tedford:

Q. [Defense Counsel:] Detective Powell, when you talked to Sergeant Tedford, he told you that a bunch of Blacks had been stabbed, didn't he?

A. [Investigator Powell:] He told me that some people had been stabbed.

Q. He didn't tell you Blacks were stabbed?

A. No. He gave me some names which I knew to be black persons.

. . .

Q. And Tedford also told you that they had been stabbed by Hispanics, did he not?

A. Not in those words, no.

Q. What did he say?

A. He said that the Herreras were involved.

Q. Okay, so you knew Blacks had been stabbed?

A. Yes, sir.

Q. And the Herreras were involved?

A. Yes, sir.

Q. And basically you suspected the Herreras of stabbing the Blacks, correct?

A. You're trying to put words in my mouth, sir. That's not what I expected.

Q. Okay.

A. I did not know that maybe the Blacks had attacked the Herreras and they were acting in self-defense.

Q. Okay. But you knew—fine. But it is fair to say you suspected the Herreras of stabbing the Blacks whether it was

---

**4.** Tex.Code Crim. Proc. art. 38.22 § 2(a) (Vernon 2005) (last amended in 2001 to include Section 8).

**5.** *See* Tex.Code Crim. Proc. art. 38.22 § 3(a)(1).

self-defense or otherwise? Would that be fair?

A. No, sir, that would not be fair. That would not be fair. I—they—I was told that the Herreras were involved. The extent of their involvement, I have no idea.

Q. But they were suspects by being involved, weren't they?

A. No, sir. They were involved. They were part of the fight.

Q. They were part of the fight. And that doesn't make them a suspect?

A. If you want to use that terminology, everybody in Caldwell County that night was a suspect.

In response to additional questioning by defense counsel, Investigator Powell testified that Gerald was in the custody of the county jail when he was interviewed and that he did not warn Gerald of his rights.

When questioned by the prosecutor, Investigator Powell stated that Gerald was not in jail because of the fight and that Gerald did not refuse to talk to him. Investigator Powell also explained why he interviewed Gerald:

At the time I talked to him the next day, I still didn't have a clear picture of what happened. It could have been that he was acting in self-defense. It could have been that he had been attacked—him and his family had been attacked. I did not have a clear picture of what happened. . . .

. . .

I knew there had been a fight. I knew that several people had been cut. I knew that some of the Herrera family had been injured, but that's all I knew.

Without entering findings, the trial judge overruled Gerald's objection and allowed Investigator Powell to testify about what Gerald had told him during the interview.

The jury found Gerald guilty of one count of aggravated assault with a deadly weapon and acquitted him of the two remaining counts. Gerald was then sentenced to eight years' imprisonment.

Gerald appealed, contending, among other things, that the trial judge erred in admitting the unrecorded oral statements that he had made to Investigator Powell.[6] Gerald claimed that the statements were admitted in violation of the Fifth Amendment and Article 38.22, Texas Code of Criminal Procedure.[7] The Third Court of Appeals held that the trial judge did not err by admitting the statements into evidence.[8] Addressing the issue of "custody" for purposes of *Miranda*, the court observed that "[c]ourts generally have declined to equate incarceration with custody[.]"[9] The court then determined that the defendant bears the burden of proving that a statement was the result of custodial interrogation[10] and, after examining the

---

6. *Herrera*, 2005 WL 3234413, at *3, 2005 Tex. App. LEXIS 10030, at *6–7.

7. *Id.*

8. *Id.* at *4, 6, *10–12, 19.

9. *Id.* at *3, *8–9 (citing *United States v. Newton*, 369 F.3d 659, 670 (2d Cir.2004); *United States v. Menzer*, 29 F.3d 1223, 1232–33 (7th Cir.1994); *Garcia v. Singletary*, 13 F.3d 1487, 1491 (11th Cir.1994); *United States v. Conley*, 779 F.2d 970, 973–74 (4th Cir.1985)).

10. *Id.* at *4, n. 4, *11 n. 4 (stating that this Court has not addressed who bears the burden of proof and adopting the United States Court of Appeals for the Fifth Circuit's determination that the defendant bears the burden of proving that a statement was the result of "custodial interrogation") (citing *United States v. Davis*, 792 F.2d 1299, 1309 (5th Cir.1986); *United States v. Charles*, 738 F.2d 686, 692 (5th Cir.1984); 41 George E. Dix & Robert O. Dawson, *Texas Practice: Criminal Practice and Procedure* § 13.384 (2d

facts of this case, the court held: "Apart from the fact of incarceration, there is no evidence of compulsion or that the statement was otherwise one of custodial interrogation."[11] Turning to Article 38.22, Texas Code of Criminal Procedure, the court held that the statement was admissible because Article 38.22 "does not preclude admission of a statement that does not stem from 'custodial interrogation.'"[12]

Gerald petitioned for review and we granted his first ground for review, which asks us to decide whether the court of appeals's decision upholding the trial court's determination that Gerald was not subject to "custodial interrogation" when interviewed by Investigator Powell in jail conflicts with the United States Supreme Court's holding in *Mathis v. United States*[13] and our decision in *Jones v. State.*[14]

## II. Law and Analysis

**A.**

 The Fifth Amendment to the United States Constitution commands that no person "shall be compelled in any criminal case to be a witness against himself[.]"[15] The warnings set out by the United States Supreme Court in *Miranda*

*v. Arizona* were established to safeguard an uncounseled individual's constitutional privilege against self-incrimination during custodial interrogation.[16] The Supreme Court has defined "custodial interrogation" as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way."[17] Unwarned statements obtained as a result of custodial interrogation may not be used as evidence by the State in a criminal proceeding during its case-in-chief.[18]

 When considering "custody" for *Miranda* purposes, we apply a "reasonable person" standard—"[a] person is in 'custody' only if, under the circumstances, a reasonable person would believe that his freedom of movement was restrained to the degree associated with a formal arrest."[19] Our "custody" inquiry also includes an examination of all of the objective circumstances surrounding the questioning.[20] The subjective belief of law enforcement officials about whether a person is a suspect does not factor into our "custody" determination unless an official's subjective belief was somehow

ed.2001)). *But see Wilkerson v. State,* 173 S.W.3d 521, 532 (Tex.Crim.App.2005) (quoting *Paez v. State,* 681 S.W.2d 34, 36 (Tex. Crim.App.1984) (stating that the defendant bears the initial burden of proving "custody")).

11. *Id.*

12. *Id.* at *4, *12.

13. 391 U.S. 1, 4–5, 88 S.Ct. 1503, 20 L.Ed.2d 381 (1968).

14. 119 S.W.3d 766, 776 (Tex.Crim.App.2003).

15. U.S. CONST. amend. V; *see also* U.S. CONST. amend. XIV.

16. 384 U.S. at 442–57, 467–79, 86 S.Ct. 1602.

17. *Id.* at 444, 86 S.Ct. 1602.

18. *Id. But see Harris v. New York,* 401 U.S. 222, 225–26, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971) (holding that *Miranda* does not foreclose the use of an unwarned statement to impeach a defendant's credibility if the statement was not coerced and given voluntarily).

19. *Dowthitt v. State,* 931 S.W.2d 244, 254 (Tex.Crim.App.1996) (citing *Stansbury v. California,* 511 U.S. 318, 322, 325, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994)).

20. *Stansbury,* 511 U.S. at 322–23, 325, 114 S.Ct. 1526; *Dowthitt,* 931 S.W.2d at 255.

conveyed to the person who was questioned.[21]

▮ Article 38.22 of the Texas Code of Criminal Procedure governs the admissibility of statements made by a defendant during custodial interrogation in a criminal proceeding.[22] Section 3 provides that an oral statement is admissible against a defendant in a criminal proceeding if, among other things: (1) the statement was electronically recorded; (2) the defendant was given the warnings set out in Section 2(a) before the statement was made and it is included on the recording; and (3) the defendant "knowingly, intelligently, and voluntarily" waived the rights set out in the warnings.[23] The warnings provided in Section 2(a) are virtually identical to the *Miranda* warnings,[24] with one exception— the warning that an accused "has the right to terminate the interview at any time" as set out in Section 2(a)(5)[25] is not required by *Miranda*. As with the *Miranda* warnings, the warnings in Section 2(a) of Article 38.22 are required only when there is custodial interrogation.[26] Our construction of "custody" for purposes of Article 38.22

is consistent with the meaning of "custody" for purposes of *Miranda*.[27]

▮ At trial, the defendant bears the initial burden of proving that a statement was the product of "custodial interrogation:"

The mere filing of a motion to suppress does not thrust a burden on the State to show compliance with *Miranda* ... warnings *unless and until* the defendant proves that the statements he wishes to exclude were the product of custodial interrogation. Thus, the State has no burden at all unless '*the record as a whole clearly establishe*[s]' that the defendant's statement was the product of custodial interrogation by an agent for law enforcement. It is the defendant's initial burden to establish those facts on the record.[28]

▮ A trial judge's ultimate "custody" determination "presents a 'mixed question of law and fact.' "[29] Therefore, we afford almost total deference to a trial judge's "custody" determination when the

---

**21.** *Stansbury*, 511 U.S. at 323–25, 114 S.Ct. 1526.

**22.** Tex.Code Crim. Proc. art. 38.22.

**23.** Tex.Code Crim. Proc. art. 38.22 § 3(a)(1)-(2).

**24.** Tex.Code Crim. Proc. art. 38.22 §§ 2(a), 3(a)(2); *Wilkerson*, 173 S.W.3d at 527 n. 14 (observing that Article 38.22 "requires a slightly more elaborate set of warnings than *Miranda*[.]"); *see also Dowthitt*, 931 S.W.2d at 258 (holding "that the language in Article 38.22 § 2(a), requiring warnings to be given by the person 'to whom the statement is made,' does not apply to oral statements [governed by § 3]...").

**25.** *Perillo v. State*, 758 S.W.2d 567, 575 (Tex. Crim.App.1988) (stating "that *Miranda* warnings must precede a confession offered under Article 38.22, § 3(c)[.]").

**26.** Tex.Code Crim. Proc. art. 38.22 §§ 3(a), 5.

**27.** *Wicker v. State*, 740 S.W.2d 779, 785 (Tex. Crim.App.1987) ("the term 'custodial interrogation' [in Article 38.22] was intended by the legislature to be construed consistently with its meaning under the Fifth Amendment to the United States Constitution.") (citing *Bass v. State*, 723 S.W.2d 687, 690–91 (Tex.Crim. App.1986)). *But see Dowthitt*, 931 S.W.2d at 254 n. 4 (stating that the issue of "custody" will be examined "from a federal constitutional perspective" and that the Court will presume that the state statutory standard is the same because the appellant failed to argue that the state and federal concepts of custody differ).

**28.** *Wilkerson*, 173 S.W.3d at 532 (quoting *Paez*, 681 S.W.2d at 36 [original emphasis]).

**29.** *Thompson v. Keohane*, 516 U.S. 99, 112–13, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995).

questions of historical fact turn on credibility and demeanor.[30] Conversely, when the questions of historical fact do not turn on credibility and demeanor, we will review a trial judge's "custody" determination *de novo*.[31] Additionally, when a trial judge denies a motion to suppress and does not enter findings of fact, the evidence is viewed "in the light most favorable to the trial court's ruling" and we "assume that the trial court made implicit findings of fact that support its ruling as long as those findings are supported by the record."[32]

**B.**

■■■ In this case, the pertinent question is whether Gerald was "in custody" within the meaning of *Miranda*. Gerald argues that he was "in custody" when questioned by Investigator Powell because he was an inmate in the county jail. He maintains that *Miranda* warnings are required when a person incarcerated on one offense is questioned by law enforcement officials about a separate offense. Because Gerald's argument is predicated, in part, on the Supreme Court's decision in *Mathis*, we consider that case first.

Mathis sought to suppress incriminating statements that he made to an Internal Revenue Service Agent who had interviewed him in prison while he was serving a sentence for another offense.[33] He maintained that the statements were inadmissible because the agent failed to provide him *Miranda* warnings prior to the questioning.[34] Rejecting the government's argument that *Miranda* is "applicable only to questioning one who is 'in custody' in connection with the very case under investigation," the Court stated that such a reading "goes against the whole purpose of the *Miranda* decision...."[35] The Court then held that "nothing in the *Miranda* opinion ... calls for a curtailment of the warnings to be given persons under interrogation by officers based on the reason why the person is in custody."[36]

Although *Mathis* may appear to be dispositive of the issue before us, our research reveals that, during the thirty-nine years since *Mathis* was decided, a majority of federal courts of appeals have concluded that *Mathis* did not institute a *per se* rule that an incarcerated individual is automatically entitled to *Miranda* warnings prior to all interrogations.[37] Several of the cases involve questioning conducted by jail or prison officials in connection with circumstances relating to jail or prison administration. For example, in *Cervantes v. Walker*, a sheriff's deputy, discovered "a

---

**30.** *Ripkowski v. State*, 61 S.W.3d 378, 381 (Tex.Crim.App.2001) (citing *Guzman v. State*, 955 S.W.2d 85, 89 (Tex.Crim.App.1997)).

**31.** *Id.* at 381–82 (citing *Guzman*, 955 S.W.2d at 89).

**32.** *State v. Ross*, 32 S.W.3d 853, 855 (Tex. Crim.App.2000).

**33.** 391 U.S. at 2–3, 88 S.Ct. 1503.

**34.** *Id.* at 3, 88 S.Ct. 1503.

**35.** *Id.* at 4, 88 S.Ct. 1503.

**36.** *Id.* at 4–5, 88 S.Ct. 1503.

**37.** *Cervantes v. Walker*, 589 F.2d 424, 427 (9th Cir.1978); *United States v. Scalf*, 725 F.2d 1272, 1275–76 (10th Cir.1984); *Conley*, 779 F.2d at 972; *United States v. Cooper*, 800 F.2d 412, 414 (4th Cir.1986); *Leviston v. Black*, 843 F.2d 302, 304 (8th Cir.1988); *Garcia*, 13 F.3d at 1491; *United States v. Turner*, 28 F.3d 981, 983 (9th Cir.1994); *Menzer*, 29 F.3d at 1231–33; *see also Flittie v. Solem*, 751 F.2d 967, 974 (8th Cir.1985); *United States v. Willoughby*, 860 F.2d 15, 23 (2d Cir.1988); *United States v. Cofield*, No. 91–5957, 1992 WL 78105, *2–3, 1992 U.S.App. LEXIS 8284, *5–8 (6th Cir. Apr. 17, 1992); *United States v. Smith*, 7 F.3d 1164, 1167 (5th Cir.1993). *But see Battie v. Estelle*, 655 F.2d 692, 697 (5th Cir.1981).

small matchbox containing a green odorless substance"[38] among Cervantes's belongings, which Cervantes left on a table outside the prison library after he was ordered to move to a different cell following his involvement in a fight with another inmate.[39] Suspecting that the green odorless substance was marijuana, the deputy "showed the contents to Cervantes and asked, 'What's this?'"[40] In response, Cervantes told the deputy that the substance was "grass."[41] Cervantes was arrested and convicted of possession of narcotics in a county jail.[42] In his federal petition for a writ of habeas corpus, Cervantes challenged the admission of his statement by the state trial judge, alleging that the admission was "violative of his privilege against self-incrimination" because he had not received *Miranda* warnings.[43]

At the outset, the Ninth Circuit Court of Appeals observed that "[t]he question in this case is unique because Cervantes was residing in jail when the questioning occurred."[44] Rejecting Cervantes's reliance on *Mathis*, the court stated, "To interpret *Mathis* as Cervantes urges would, in effect, create a *per se* rule that any investigatory questioning inside a prison requires *Miranda* warnings."[45] The court reasoned that "[s]uch a rule could totally disrupt prison administration" and "would not only be inconsistent with *Miranda* but would torture it to the illogical position of providing greater protection to a prisoner than to his nonimprisoned counterpart."[46]

Observing that custodial interrogation exists when "a reasonable person would have believed he could not leave freely,"[47] the court stated that "[w]hen prison questioning is at issue," the "'free to leave' standard ceases to be a useful tool in determining the necessity of *Miranda* warnings" because "[i]t would lead to the conclusion that all prison questioning is custodial because a reasonable prisoner would always believe he could not leave the prison freely."[48] The court then considered the "concept of 'restriction'" as used by the Supreme Court in *Oregon v. Mathiason*, a case involving station-house questioning.[49] There, the Court found that Mathiason, who confessed to burglarizing a house, voluntarily came to the police station to talk to a police officer, was informed that he was not under arrest, and was able to leave the "station without hindrance" after he was interviewed by police.[50] The Court held that there was "no indication that the questioning took place in a context where [Mathiason's] freedom to depart was restricted in any way."[51] After taking note of *Mathiason*, the Ninth Circuit stated:

> The concept of 'restriction' is significant in the prison setting, for it implies the need for a showing that the officers have

---

38. 589 F.2d at 427.

39. *Id.* at 426.

40. *Id.* at 427.

41. *Id.*

42. *Id.* at 425, 427.

43. *Id.*

44. *Id.* at 427.

45. *Id.*

46. *Id.*

47. *Id.*

48. *Id.* at 428.

49. *Id.* (discussing and citing *Oregon v. Mathiason*, 429 U.S. 492, 495, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977) (per curiam)).

50. *Mathiason*, 429 U.S. at 493, 495, 97 S.Ct. 711.

51. *Id.* at 495, 97 S.Ct. 711.

in some way acted upon the defendant so as to have 'deprived (him) of his freedom of action in any significant way,'.... In the prison situation, this necessarily implies a change in the surroundings of the prisoner which results in an added imposition on his freedom of movement. Thus, restriction is a relative concept, one not determined exclusively by lack of freedom to leave. Rather, we look to some act which places further limitations on the prisoner.[52]

Utilizing a "reasonable person" standard and its four-factor " 'free to leave' " test, the court set out the following circumstances to consider when determining "whether a reasonable person would believe there had been a restriction of his freedom over and above that in his normal prisoner setting":

- "the language used to summon the individual,"
- "the physical surroundings of the interrogation,"
- "the extent to which he is confronted with evidence of his guilt, and"
- "the additional pressure exerted to detain him[.]" [53]

The court then applied the foregoing factors to the facts of the case before it and found that: (1) the deputy "sought to ascertain the nature of the substance" following a routine search; (2) "[t]he questioning took place in the prison library and appears to have been a spontaneous reaction to the discovery;" and (3) "neither the prison setting nor the presence of [the deputy] ... exerted a pressure to detain sufficient to have caused a reasonable person to believe his freedom of movement had been further diminished." [54] As a result, the court concluded that Cervantes's statement was admissible because *Miranda* warnings were not required.[55]

The Seventh Circuit has also refused to hold that *Mathis* requires *Miranda* warnings in every instance in which an inmate is questioned by government agents. Building on the Ninth Circuit's holding in *Cervantes* and decisions from other circuit courts, in *United States v. Menzer,* the Seventh Circuit concluded that an inmate is not *ipso facto* "in custody" for purposes of *Miranda* when the inmate is questioned by outside law enforcement officials about an offense unrelated to the inmate's incarceration and to prison administration.[56] In that case, agents from the Federal Bureau of Investigation, who were investigating the arson of Menzer's home and business, which resulted in the death of his son and step-son, went to talk to Menzer about the arson while he was imprisoned for sexual exploitation.[57] When confronted with Menzer's claim that the statements should have been suppressed because he did not receive *Miranda* warnings before he was interrogated,[58] the court concluded that *Mathis* "did not expressly address the question of whether imprisonment *per se* constitutes being 'in custody' for purposes of *Miranda.*" [59] The court went on to note that the "Second, Fourth, Eighth and Ninth Circuits have held that when challenging a statement given by a defendant, merely because the defendant is in prison

---

**52.** *Cervantes,* 589 F.2d at 428 (internal citation omitted).

**53.** *Id.*

**54.** *Id.* at 429.

**55.** *Id.*

**56.** *Menzer,* 29 F.3d at 1231–33.

**57.** *Id.* at 1225–26.

**58.** *Id.* at 1230.

**59.** *Id.* at 1231.

on an unrelated charge does not mean the defendant is 'in custody' under *Miranda*." [60] The court further observed that those courts have "examined 'the totality of the circumstances'" when determining whether a defendant was "in custody" [61] and that the following factors have been considered by courts when assessing whether a prisoner was "in custody:" (1) "the defendant's 'freedom to leave the scene and the purpose, place and length' of the questioning[;]" [62] (2) "'a change in the surroundings of the prisoner which results in an added imposition on his freedom of movement[;]'" [63] and (3) "whether 'circumstances ... suggest any measure of compulsion above and beyond the confinement[.]'" [64]

The court rejected Menzer's argument that he was "in custody" because he was not free to leave the interrogation due to his incarceration, stating "While it is undisputed that the defendant was incarcerated for an unrelated crime, we conclude that Menzer was not 'in custody' for the purposes of *Miranda* because there was no 'added imposition on his freedom of movement' nor 'any measure of compulsion above and beyond [imprisonment]'." [65] In reaching its conclusion, the court considered the following facts: Menzer was told that an agent was coming to talk to him; he was not restrained; the room was well lit with "two windows exposing the interview room to the prison administrative

office;" the door to the room was unlocked; and, Menzer was told "that he was free to leave at any time." [66] Quoting *Cervantes*, the court reasoned that "a holding that incarceration *per se* results in custody under *Miranda* would result in 'the illogical position of providing greater protection to a prisoner than to his nonimprisoned counterpart.'" [67]

Next, we consider our decision in *Jones*, which Gerald also cites as supporting precedent in his ground for review. In *Jones*, we addressed the State's argument "that a defendant is not necessarily 'in custody' solely because he is questioned while incarcerated." [68] We observed that the State relied on federal appellate court cases holding "that there must be a change in the inmate's surroundings or an added imposition on his freedom of movement before he is 'in custody' for *Miranda* purposes." [69]

While incarcerated in the county jail based on suspicion for the murder of his great-aunt, Jones was questioned by a Texas Ranger about two extraneous murders. [70] Jones confessed to the extraneous murders after the Ranger told him that Jones's friend "Red" had told him (the Ranger) that Jones was "primarily responsible for the murders." [71] We held that Jones was in custody for purposes of *Miranda* when he confessed to the extraneous murders. [72] Our "custody" determination was based on the fact that Jones had

60. *Id.*

61. *Id.* at 1232.

62. *Id.* (quoting *Leviston*, 843 F.2d at 304).

63. *Id.* (quoting *Conley*, 779 F.2d at 973).

64. *Id.* (quoting *Willoughby*, 860 F.2d at 24).

65. *Id.*

66. *Id.*

67. *Id.* (quoting *Cervantes*, 589 F.2d at 427).

68. 119 S.W.3d at 776.

69. *Id.* (citing *Cooper*, 800 F.2d at 414; *Cervantes*, 589 F.2d at 424).

70. *Id.* at 770–71, 776.

71. *Id.* at 771.

72. *Id.* at 776.

been subjected to "a classic police 'interrogation' environment."[73] The record showed that Jones had been moved to another part of the jail early in the morning to meet with the Ranger, was placed in a small interview room, was informed that the Ranger was investigating the extraneous murders, and was confronted with Red's statement accusing him of the murders.[74]

We are unpersuaded by Gerald's reliance on *Jones*. Our resolution of the State's argument did not require us to decide whether *Mathis* compels the use of *Miranda* warnings before all inmate interrogations. Now that we have been presented with the opportunity to finally decide this issue, we decline to read *Mathis* as instituting a bright-line rule. We agree with the interpretation of *Mathis* adopted by a majority of the federal appellate courts: Although *Mathis* holds that *Miranda* warnings may be required when an inmate is questioned by law enforcement officials, *Mathis* does not hold that *Miranda* warnings must precede all inmate interrogations. Indeed, the Supreme Court implicitly acknowledged this fact in *dicta* in its 1990 opinion in *Illinois v. Perkins*, stating "The bare fact of custody may not in every instance require a warning even when the suspect is aware that he

is speaking to an official, but we do not have occasion to explore that issue here."[75] We therefore hold that incarceration does not always constitute "custody" for *Miranda* purposes when an inmate is questioned by law enforcement officials "regarding an offense separate and distinct from the offense for which he was incarcerated."[76]

The *Miranda* decision itself supports our conclusion. In *Miranda*, the Court was primarily concerned with the fact that custodial interrogation is inherently coercive; it typically involves "incommunicado" questioning "in a police-dominated atmosphere"[77] and "compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely."[78] We find no basis for the assumption that the coercive aspects of custodial interrogation are present in every instance in which an inmate is questioned by a law enforcement officer.[79] Even though an inmate is not at liberty to leave a detention facility, the deprivation of freedom is not absolute. Inmates, in varied degrees, retain some level of freedom and autonomy while incarcerated. Thus, encounters between a government agent and an inmate will, in some cases, closely resemble situations involving station-house questioning found non-custo-

---

73. *Id.*

74. *Id.*

75. 496 U.S. 292, 299, 110 S.Ct. 2394, 110 L.Ed.2d 243 (1990); *see also Bradley v. Ohio*, 497 U.S. 1011, 1012, 110 S.Ct. 3258, 111 L.Ed.2d 768 (1990) (Brennan, J., dissenting from refusal to grant certiorari) (citing *Perkins* and stating, "This Court recently left open the question whether 'the bare fact of custody would in every instance require a warning even when the suspect is aware that he is speaking to an official.' ").

76. *Menzer*, 29 F.3d at 1231.

77. *Miranda*, 384 U.S. at 445, 86 S.Ct. 1602.

78. *Id.* at 467, 86 S.Ct. 1602.

79. *See* Magid, *Questioning the Question–Proof Inmate: Defining Miranda Custody for Incarcerated Suspects* (1997) 58 Ohio St. L.J. 883, 933 ("custody in layperson's terms is not necessarily custody for *Miranda* purposes. *Miranda's* definition of custody reflects a concern more with the coercive forces that may affect interactions between a suspect and an interrogating official, and less with the fact that a person's ability to select his activities and routine is greatly limited as an inmate.").

dial for *Miranda* purposes.[80] In such cases, Gerald's interpretation of *Mathis* would lead to the inequitable outcome expressed by the Ninth Circuit—that an inmate is accorded greater rights under the Fifth Amendment than a non-imprisoned individual. The application of the exclusionary rule in such circumstances does not further the interests protected by *Miranda*—to prohibit the use of unreliable and involuntary confessions.[81]

Because we refuse to equate incarceration with "custody" for purposes of *Miranda* when an inmate is questioned by a state agent about an offense unrelated to the inmate's incarceration, we turn to our traditional "custody" analytical framework. We evaluate "custody" "on an ad hoc basis, after considering all of the (objective) circumstances"[82] and apply the "reasonable person" standard.[83] "Two discrete inquiries are essential to the determination [of "custody"]: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave."[84]

Consistent with the facts that we found determinative in *Jones*, an evaluation of the circumstances surrounding an interrogation in this context should include an examination of the factors considered significant by the Ninth and Seventh circuit courts. Dispensing with quotations and citations, these factors include, but are not necessarily limited to:

- the language used to summon the inmate;
- the physical surroundings of the interrogation;
- the extent to which the inmate is confronted with evidence of his or her guilt;
- the additional pressure exerted to detain the inmate or the change in the surroundings of the inmate which results in an added imposition on the inmate's freedom of movement; and
- the inmate's freedom to leave the scene and the purpose, place, and length of the questioning.

In this case, the record shows that Gerald failed to meet his initial burden of establishing that he was "in custody" for *Miranda* purposes.[85] Beyond the purpose of the questioning—to gather information about the fight—the record is devoid of any facts relating to the factors relevant to determining "custody" for purposes of *Miranda* in this context. The purpose of the questioning, standing alone, in this instance, does not show "custody" within the meaning of *Miranda*. Accordingly, we

**80.** *See Mathiason*, 429 U.S. at 495, 97 S.Ct. 711; *California v. Beheler*, 463 U.S. 1121, 1125–26, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983) (per curiam); *see e.g.*, *Menzer*, 29 F.3d at 1232–33; *People v. Macklem* (2007) 149 Cal.App.4th 674, 695–96, 57 Cal.Rptr.3d, 237, 253; *Lindsey v. United States*, 911 A.2d 824, 832–33 (D.C.2006); *State v. Pehowic*, 147 N.H. 52, 780 A.2d 1289, 1291–92 (2001); *Commonwealth v. Larkin*, 429 Mass. 426, 708 N.E.2d 674, 681–82 (1999); *State v. Ford*, 144 N.H. 57, 738 A.2d 937, 943 (1999).

**81.** *Sanchez–Llamas v. Oregon*, 548 U.S. 331, ——, 126 S.Ct. 2669, 2681, 165 L.Ed.2d 557 (2006) (citing *Watkins v. Sowders*, 449 U.S. 341, 347, 101 S.Ct. 654, 66 L.Ed.2d 549 (1981) ("We require exclusion of coerced confessions both because we disapprove of such coercion and because such confessions tend to be unreliable.")).

**82.** *Dowthitt*, 931 S.W.2d at 255; *Stansbury*, 511 U.S. at 322–23, 114 S.Ct. 1526

**83.** *Dowthitt*, 931 S.W.2d at 254; *Stansbury*, 511 U.S. at 322, 325, 114 S.Ct. 1526.

**84.** *Thompson*, 516 U.S. at 112, 116 S.Ct. 457.

**85.** *Wilkerson*, 173 S.W.3d at 532.

hold that the court of appeals did not err in affirming the trial judge's "custody" determination.

## III. Conclusion

We conclude that the court of appeals correctly held that Gerald was not "in custody" within the meaning of *Miranda* when questioned by Investigator Powell about the fight while in the county jail on an unrelated offense. The judgment of the court of appeals is affirmed.

COCHRAN, J., filed a concurring opinion.

JOHNSON, J., filed a dissenting opinion in which PRICE, J., joined.

HOLCOMB, J., filed a dissenting opinion in which PRICE, J., joined.

COCHRAN, J., filed a concurring opinion.

I join the majority opinion. I add these remarks only to emphasize what the record does not show. It does not show that appellant established the essential fact of "custodial interrogation." Like the trial court, the unanimous Third Court of Appeals,[1] and now a majority of this Court, I simply do not know enough about the setting in which appellant and Investigator Powell conducted their discussion to determine that this was a "custodial interrogation." Here is what we do know:

(1) Appellant was arrested on an unrelated outstanding warrant;

(2) He spent the night in jail;

(3) The next morning Investigator Powell "asked [appellant] some questions. At that time, [he] was gathering information and didn't know Mr. Herrera's involvement, if any, in the assault."

What we do not know is where in the jail and under what circumstances this "interview," "questioning," or "discussion" took place. Perhaps it was a scenario involving custodial interrogation. Perhaps it was not. The record is simply incomplete. Nobody ever asked the questions to establish whether this was or was not a "custodial interrogation" setting.

As the court of appeals noted, this Court has never directly stated who bears the burden of establishing that a "custodial interrogation" took place.[2] Although neither of the parties have addressed this issue in their Briefs or acknowledged the importance of this issue, I agree with the court of appeals' suggestion that this is the defendant's burden.[3]

The right to *Miranda* warnings applies once the defendant establishes that the setting is one of custodial interrogation.[4]

---

**1.** *Herrera v. State*, No. 03–04–00766–CR, 2005 WL 3234413, 2005 Tex.App. LEXIS 10030 (Tex.App.-Austin Dec. 1, 2005) (not designated for publication).

**2.** *Herrera*, 2005 WL 3234413, at *4, n. 4, 2005 Tex.App. LEXIS 10030 at *11 n. 4.

**3.** *See id.* Footnote four of the court of appeals' opinion reads:

Although the Texas Court of Criminal Appeals has not addressed who bears the burden of proving that the statement was not the result of custodial interrogation, the Court of Appeals for the Fifth Circuit has held that a defendant bears the burden of proving that a prosecution-offered statement is one to which *Miranda* applies. *United States v. Davis*, 792 F.2d 1299, 1309 (5th Cir.1986); *United States v. Charles*, 738 F.2d 686, 692 (5th Cir.1984); *see also* 41 GEORGE E. DIX & ROBERT O. DAWSON, TEXAS PRACTICE: CRIMINAL PRACTICE AND PROCEDURE § 13.384 (2d ed.2001).

**4.** *See, e.g., Paez v. State*, 681 S.W.2d 34, 38 (Tex.Crim.App.1984) (upholding the admission of a statement that the jailed suspect had given to a Department of Human Resources worker because we were "unable to say that the record as a whole establishes that [defendant's] statements ... were the product of"

Only then does the State have "a heavy burden" to establish that *Miranda* warnings were given and that the defendant voluntarily waived those rights and voluntarily responded to custodial questioning.[5] In this case we know that there was a "one-on-one" discussion between appellant and Investigator Powell while appellant was housed in the Caldwell County Jail on other charges. We do not know where they spoke; we do not know how they came to have a discussion; we do not know anything about the circumstances under which they talked. We do not know enough to make an intelligent decision about whether there was "custodial interrogation." I conclude that this is why every court that has considered the matter has properly rejected appellant's contention.

JOHNSON, J., filed a dissenting opinion in which PRICE, J., joined.

I respectfully dissent. The state presented evidence during the guilt phase of trial that, in July 2001, appellant was involved in a fight with a group of African-American males at a local bar after appellant's sister got into an argument with one of the males. Several participants were cut or stabbed, and witnesses testified that appellant and his brother may have used knives during the fight. Appellant attempted to leave the scene with his parents after the fight, but police stopped and searched the car in which appellant was riding and found a knife on the back floorboard of the car. They arrested appellant on an outstanding warrant on an unrelated charge.

The following morning at the jail, Lockhart Police Detective David Powell began a "preliminary investigation" and questioned appellant about the events from the previous night. Powell testified at trial that he asked appellant questions only to determine his level of involvement in the fight, if any. Appellant told Powell that he had participated in the fight and that the knife recovered from the car belonged to him. However, appellant was not advised of his constitutional rights, nor was his statement recorded.

Approximately eight days after the fight, appellant provided to police a sworn written statement admitting participation in the fight and ownership of the knife. The sworn statement was not offered into evidence at trial, but its contents, as well as that of the unrecorded oral statements, were introduced through Powell's testimony. Appellant filed a motion to suppress the unrecorded oral statements, but did not seek a hearing on the motion prior to trial. At trial, appellant objected to the introduction of the unrecorded oral statements, but the trial court overruled his objection and admitted Powell's testimony.

### Custodial Interrogation

The United States Supreme Court has held that an individual is "in custody" for *Miranda* purposes if, under the circumstances, a reasonable person would believe his freedom of movement is curtailed to a "degree associated with formal arrest." *Berkemer v. McCarty,* 468 U.S. 420, 440, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984)(quoting *California v. Beheler,* 463 U.S. 1121, 1125, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983)); *Dowthitt v. State,* 931 S.W.2d 244,

custodial interrogation by a state official); *see also State v. Rosado,* 218 Conn. 239, 588 A.2d 1066, 1073 (1991) (stating that "the defendant has the initial burden of showing that he was subjected to custodial interrogation").

5. *Miranda v. Arizona,* 384 U.S. 436, 475, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

254 (Tex.Crim.App.1996). Moreover, the language of *Miranda* is devoid of any suggestion that the administration of the warnings are tied to the reason that a particular individual is in custody. *Mathis v. United States,* 391 U.S. 1, 4–5, 88 S.Ct. 1503, 20 L.Ed.2d 381 (1968). The sole, relevant, objective inquiry is the perspective of a reasonable person in the suspect's situation. *Dowthitt,* 931 S.W.2d at 255. The custody determination must be made on an *ad hoc* basis after considering all of the objective circumstances, and that "[s]tationhouse questioning does not, in and of itself, constitute custody." *Id.* at 257.

The term "interrogation" as it relates to the application of *Miranda,* refers not only to express questioning, but also to any words or actions on the part of the police that the police knew or should have known are reasonably likely to elicit an incriminating response. *Rhode Island v. Innis,* 446 U.S. 291, 300–02, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980); *Jones v. State,* 795 S.W.2d 171, 174–75 (Tex.Crim.App.1990). The definition of "incriminating" is broad and includes any inculpatory or exculpatory statements that the prosecution might seek to introduce. *Jones,* 795 S.W.2d at 176 n. 7. Whether an individual was both in custody and subjected to police interrogation, therefore, requires a fact-specific inquiry.

### Interrogation

Sergeant Tedford testified that he stopped the Herreras' car. Maria Herrera was driving, Natividad Herrera, with an obvious recent injury to his eye, sat in the front passenger seat, and appellant sat in the right-rear passenger seat. As Tedford spoke with the Herreras, one of the injured parties, Shaun Russell, approached Tedford, pointed at the Herreras, and said, "They cut me." Russell did not at that time identify which of the Herreras he meant. Tedford asked for a warrant check on all three Herreras. He arrested appellant on an outstanding warrant on an unrelated charge.

Powell testified that, when he was called to the scene by Tedford, "the first thing I did when I arrived, I talked to the supervisor on the scene, Sergeant Tedford. He gave me a brief rundown of what he knew." Presumably, the rundown included Russell's direct accusation against the Herreras. In later testimony, Powell denied that the Herreras were "suspects."

Q. Detective Powell, when you talked to Sergeant Tedford, he told you that a bunch of Blacks had been stabbed, didn't he?

A. He told me that some people had been stabbed.

Q. He didn't tell you Blacks were stabbed?

A. No. He gave me some names which I knew to be Black persons.

* * *

Q. And Tedford also told you that they had been stabbed by Hispanics, did he not?

A. Not in those words, no.

Q. What did he say?

A. He said the Herreras were involved.

Q. Okay. So you knew Blacks had been stabbed?

A. Yes, sir.

Q. And the Herreras were involved?

A. Yes, sir.

Q. And basically you suspected the Herreras of stabbing the Blacks, correct?

A. You're trying to put words in my mouth, sir. That's not what I suspected.

Q. Okay.

A. I did not know that maybe the Blacks had attacked the Herreras and they were acting in self-defense.

Q. Okay. But you knew—fine, but is it fair to say you suspected the Herreras of stabbing the Blacks whether it was self-defense or otherwise? Would that be fair?

A. No, sir, that would not be fair. That would not be fair. I—they—I was told that the Herreras were involved. The extent of their involvement, I have no idea.

Q. But they were suspects by being involved, weren't they?

A. No, sir. They were involved. They were part of the fight.

Q. They were part of the fight. And that doesn't make them a suspect?

A. If you want to use that terminology, everybody in Caldwell County that night was a suspect.

Powell's testimony indicates that he got a "rundown" from Tedford, who had witnessed Shaun Russell accuse the Herreras of "cutting" him. Speculation by Powell that the Herreras might have acted in self-defense, a claim that requires an admission of the act, led to disingenuous answers to counsel's questions. Such speculation does not alter the fact that the Herreras were suspected of stabbing one or more of the victims, having been publicly accused by a victim and a knife having been found in their car. I conclude that, when Powell went to the jail to speak to appellant, he knew that appellant was a suspect. Because Powell already knew that appellant was involved in the fight in some capacity, he therefore also knew or should have known that questioning appellant about the fight had the potential to determine the nature and extent of appellant's culpa-

bility in the bar fight and therefore, the potential to elicit incriminating responses. Thus Powell's questioning constituted "interrogation."

### Custody

In *Jones v. State*, 119 S.W.3d 766, 776 (Tex.Crim.App.2003), a case that also involved questioning of a jail inmate, we recognized the state's argument and citation of cases from other jurisdictions holding that there must be a change in an inmate's surrounding or an added imposition upon his freedom of movement before he is in "custody" for *Miranda* purposes, but we did not specifically adopt the state's argument. We concluded that, under the circumstances in that case, Jones was in custody for *Miranda* purposes.[1] We pointed out that Jones had been taken to a small (approximately 8' X 12') interview room to meet with two officers, who informed him that they were investigating two specific murders and asked him what he would think if Jones' good friend "Red" had already informed them that Jones had the "primary responsibility" and was the "bad guy" in the two murders. *Jones*, 119 S.W.3d at 776.

Although the record does not reveal the size of the room in which appellant was questioned in the Caldwell County Jail, it does reflect that appellant was interviewed by Powell, who was a law-enforcement officer not employed in the jail. Appellant's freedom was thus curtailed more severely than was usual in the jail environment. Powell, who had been given a "run-down" by the officers on the scene, engaged in "a one-on-one interview" of appellant as an "involved person" in the investigation of a large bar fight that resulted in severe injuries to several persons. During that interview, appellant conceded his presence at

1. *See also Cooks v. State*, 844 S.W.2d 697, 734 (Tex.Crim.App.1992)("Clearly, while incarcer- ated in the Dallas County Jail, [Cooks] was 'in custody.' ").

the bar when the fight broke out. Pursuant to *Dowthitt*, appellant was "in custody" for the purposes of *Miranda* from that point on. *Dowthitt*, 931 S.W.2d at 257 ("[W]e believe that 'custody' began after appellant admitted to his presence during the murders.")

I am in no way suggesting a broad *per se* rule that *Mathis* requires *Miranda* warnings in every instance in which an inmate is questioned by law enforcement while incarcerated on an unrelated charge or conviction. Whether an incarcerated inmate is in "custody" for *Miranda* purposes must be determined on an *ad hoc* basis.

### Article 38.22

Even if appellant had been given his *Miranda* warnings prior to questioning, the oral statements that Officer Powell solicited from appellant while appellant was incarcerated are inadmissible because the oral statements fail to comply with the requirements set out in Tex.Code Crim. Proc. art. 38.22.

Generally, courts should interpret a statute in light of its plain language. *Boykin v. State*, 818 S.W.2d 782, 785 (Tex.Crim. App.1991). Section 3 of Tex.Code Crim. Proc. art. 38.22 governs the use of oral statements made as a result of a custodial interrogation and expressly requires that: (1) the accused be given *Miranda* warnings; (2) he knowingly, voluntarily, and intelligently waive those rights; and (3) an electronic recording of the statements be made.[2]

Here, Powell testified that he neither gave appellant his *Miranda* warnings nor recorded appellant's oral statements. On the contrary, Powell testified that he conducted a "one-on-one interview" with appellant and that he took notes on their conversation. These notes, Powell testified, later became part of his police report. According to the plain language of the statute, Powell's actions are insufficient to

---

**2.** Tex.Code Crim. Proc. art. 38.22 When Statements May Be Used

❧ ❧ ❧ ❧

Sec. 2 No written statement made by an accused as a result of custodial interrogation is admissible as evidence against him in any criminal proceeding unless it is shown on the face of the statement that:

(a) the accused, prior to making the statement, either received from a magistrate the warning provided in Article 15.17 of this code or received from the person to whom the statement is made a warning that:

(1) he has a right to remain silent and not make any statement at all and that any statement he makes may be used against him at his trial;

(2) any statement he makes may be used as evidence against him in court;

(3) he has the right to have a lawyer present to advise him prior to and during any questioning;

(4) if he is unable to employ a lawyer, he has the right to have a lawyer appointed to advise him prior to and during any questioning; and

(5) he has the right to terminate the interview at any time; . . .

Article 15.17 deals with the duties of arresting officers and magistrates.

Sec. 3 (a) No oral or sign language statement of an accused made as a result of custodial interrogation shall be admissible against the accused in a criminal proceeding unless:

(1) an electronic recording, which may include motion picture, video tape, or other visual recording, is made of the statement;

(2) prior to the statement but during the recording the accused is given the warning in Subsection (a) of Section 2 above and the accused knowingly, intelligently, and voluntarily waives any rights set out in the warning;

(3) the recording device was capable of making an accurate recording, the operator was competent, and the recording is accurate and has not been altered;

(4) all voices on the recording are identified; . . . .

satisfy the requirements of Tex.Code Crim. Proc. art. 38.22.

### Conclusion

*Miranda* requires that a defendant who is in custody for *Miranda* purposes and subjected to police interrogation be given proper warnings about his constitutional rights prior to questioning. Appellant was in such custody and subjected to custodial interrogation, but he did not receive *Miranda* warnings. Further, appellant's oral statements were not recorded as is required by Tex.Code Crim. Proc. art. 38.22. It was therefore error to admit his custodial statements into evidence. I would remand the cause to the court of appeals for a harm analysis.[3]

HOLCOMB, J., filed a dissenting opinion, in which PRICE, J., joined.

After reviewing the record, I conclude that: (1) appellant met his burden of establishing that his unwarned oral statements to the Lockhart police were the product of custodial interrogation[1] and (2) the trial court abused its discretion when it denied appellant's motion to suppress and admitted his unwarned oral statements into evidence.[2] Accordingly, I would reverse the judgment of the court of appeals and remand the case to that court for a harm analysis.

Allow me to review the relevant facts: Shortly after he was indicted for aggravated assault, appellant filed a pretrial motion in the trial court to suppress any oral statements that may have been taken from him in violation of the Fifth Amendment as interpreted in *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Appellant's motion to suppress was carried forward to his trial, which was held before a jury.

Among the State's witnesses at the guilt stage of appellant's trial were William Tedford, Abel Garza, and David Powell. All three of these witnesses testified, in relevant part, before the trial court ruled on appellant's motion to suppress.

Tedford testified that: (1) he was a Lockhart police sergeant; (2) one night in July 2001, while he was patrolling Lockhart in his police car, he received a radio dispatch advising him of "a large distur-

---

**3.** The state briefly suggests that "[i]f this Court should find that the statement was improperly admitted, it should hold that [appellant] failed to properly preserve this claim by attempting to offer the same or similar evidence in the form of [his] written statement given to Officer Powell" a few days after his release from jail. I again note that the written statement was not offered into evidence at trial. The state fails to delineate where in the record appellant attempted to offer his written statement or to explain how an unsuccessful attempt would waive his prior objection to Officer Powell's testimony regarding the contents of appellant's unrecorded oral statements.

The state also suggests that, for the sake of judicial economy, this Court should address the harm from such error, if any, and find it to be harmless beyond a reasonable doubt. After a finding that the court of appeals has erred in its decision on the admissibility of evidence, our practice is to remand to the court of appeals to conduct the harm analysis in the first instance. *See, e.g., Owens v. State,* 827 S.W.2d 911, 917 n. 7 (Tex.Crim.App. 1992); *Hoang v. State,* 939 S.W.2d 593, 598 (Tex.Crim.App.1996)("[I]t is not ordinarily this Court's bailiwick to pass upon questions of harm in the first instance[.]")

**1.** A defendant has the burden of establishing that his statements were the product of custodial interrogation. *Wilkerson v. State,* 173 S.W.3d 521, 532 (Tex.Crim.App.2005).

**2.** A trial court's ruling on a motion to suppress is reviewed on appeal for abuse of discretion. *State v. Dixon,* 206 S.W.3d 587, 590 (Tex.Crim.App.2006). In other words, the trial court's ruling will be upheld if it is reasonably supported by the record and is correct under any applicable legal theory. *Ibid.*

bance taking place at [the] El Mira Mar Bar [on] North Pecos Street"; (3) he proceeded to the scene of the disturbance, and, upon arrival, a fellow Lockhart police officer advised him to stop a vehicle that was attempting to leave the scene; (4) he stopped the vehicle in question, and, using the occupants' driver's licenses, he identified them as Maria Herrera, Natividad Herrera, and their son, appellant; (5) appellant was seated in the backseat of the vehicle; (6) Maria Herrera advised him "that they had been in a fight" and "that those people had hit her husband [Natividad] with a bottle"; (7) as he was talking with Maria Herrera, one Shaun Russell, who was wounded and bleeding badly, rushed up to him, pointed at all three Herreras, and said, "They cut me"; (8) he believed at that time that, in light of Russell's accusation, he had probable cause to arrest all three Herreras; (9) he contacted Lockhart Police Department Investigator David Powell, who was on call that night, to assist in the investigation of the fight; and (10) he was still at the scene when Powell arrived there sometime later.

Garza testified that: (1) he was a Lockhart police officer; (2) during the early morning hours of July 22, 2001, while he was patrolling Lockhart in his police car, he received a radio dispatch concerning "a disturbance in progress involving multiple subjects"; (3) he proceeded to the scene of the disturbance and, upon arrival, found that Sergeant Tedford was already there and situated beside a red vehicle; (4) he identified the occupants of the red vehicle as Maria Herrera, Natividad Herrera, and appellant; (5) he searched the Herreras' vehicle and found a knife on the back floorboard; and (6) he arrested appellant

on an outstanding warrant and took him to the county jail.

Finally, Powell testified that: (1) he was an investigator with the Lockhart Police Department; (2) his duties as an investigator included "tak[ing] statements, interviews, [and] interrogations"; (3) at approximately 1:00 a.m. on July 22, 2001, he was called to the scene of "a large fight" at the Mira Mar Bar in Lockhart; (4) upon arrival, Sergeant Tedford gave him "a brief rundown of what he knew" and told him "that some people had been stabbed" and "that the Herreras were involved"; (5) he (*i.e.,* Powell) determined at that time that some of the people stabbed were African–American;[3] (6) at approximately 8:00 a.m. on July 22, 2001, he went to the county jail and, in a "one-on-one interview," questioned appellant about "what occurred" on the previous night; and (7) although he believed that appellant was in custody at that time, he did not *Mirandize* him before questioning him.

Before Powell could describe for the jury exactly what appellant had told him, appellant, citing his pretrial motion to suppress, objected that his statements to Powell had been taken without *Miranda* warnings and thus were inadmissible at trial. The trial court, without explaining its reasoning, overruled appellant's objection and allowed Powell to proceed with his testimony.[4] At the time the trial court ruled, it had heard all the testimony recounted above.

Under *Miranda,* law enforcement officials, before questioning an individual in custody, must inform him that: (1) he has the right to remain silent; (2) anything he

---

3. The record reflects that the Herreras are Hispanic, as their name would suggest.

4. In its opinion, the majority states that the trial court "determined" that appellant was not in custody, for the purposes of *Miranda,* at the time Powell questioned him. That is incorrect. The trial court gave no explanation for its ruling.

says can be used against him in a court of law; (3) he has the right to the presence of an attorney during any questioning; and (4) if he cannot afford an attorney, one will be appointed for him. *Miranda v. Arizona*, 384 U.S. at 478–479, 86 S.Ct. 1602. These warnings protect an individual's Fifth Amendment right not to incriminate himself against the inherently coercive nature of custodial interrogation. *Id.* at 444, 86 S.Ct. 1602. "[C]ustodial police interrogation, by its very nature, isolates and pressures the individual." *Dickerson v. United States*, 530 U.S. 428, 435, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000). "Even without employing brutality, the 'third degree,' or [other] specific strategems, . . . the very fact of custodial interrogation exacts a heavy toll on individual liberty and trades on the weakness of individuals." *Miranda v. Arizona*, 384 U.S. at 455, 86 S.Ct. 1602.

*Miranda* warnings must be given only when an individual is both in custody and subjected to interrogation. *Illinois v. Perkins*, 496 U.S. 292, 297, 110 S.Ct. 2394, 110 L.Ed.2d 243 (1990). This is so because custody and interrogation may create mutually reinforcing pressures that may overcome an individual's will to remain silent. *Ibid.* The *Miranda* warnings must be given even when the purpose of the custody is unrelated to the purpose of the interrogation. *Mathis v. United States*, 391 U.S. 1, 4–5, 88 S.Ct. 1503, 20 L.Ed.2d 381 (1968).

In determining whether an individual is "in custody" for purposes of receiving *Miranda* warnings, "the ultimate inquiry is simply whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983) (quoting *Oregon v. Mathiason*, 429 U.S. 492, 495, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977)). The term "interrogation," for purposes of receiving *Miranda* warnings, "refers not only to express questioning, but also to any other words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response." *Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). The phrase, "incriminating response," refers to any response—whether inculpatory or exculpatory—that the prosecution may seek to introduce at trial. *Id.* at fn. 5.

Given the evidence before the trial court at the time it ruled on appellant's objection to Powell's testimony, any reasonable trial court would have necessarily concluded that appellant had satisfied his burden of establishing that, at the time Powell questioned him, he was "in custody" for purposes of receiving *Miranda* warnings. The testimony of both Powell and Garza established that, at the relevant time, appellant was under formal arrest in the Caldwell County Jail on an outstanding warrant. Appellant was, therefore, as a matter of law, "in custody" for purposes of *Miranda*. *California v. Beheler*, 463 U.S. at 1125, 103 S.Ct. 3517; *Mathis v. United States*, 391 U.S. at 4–5, 88 S.Ct. 1503. *See Cooks v. State*, 844 S.W.2d 697, 734 (Tex. Crim.App.1992) ("Clearly, while incarcerated in the Dallas County Jail, appellant was 'in custody' [for purposes of *Miranda* ]."); W. LaFave, *et. al, Criminal Procedure* § 6.6(d) (2nd ed.1999) (an individual in custody at a police station is "obviously" in custody for purposes of *Miranda* ). Nothing in *Miranda* or its progeny suggests that it matters *where* in the jail an arrested individual is at the moment he is subjected to questioning.

The cases cited by the majority today for its novel holding all involve prison administration and prison inmates, not persons who are under arrest awaiting further proceedings. The majority's new multi-

factor test for determining whether a person is in custody for *Miranda* purposes may make some sense in the prison context, where inmates may spend months or even years living out their lives, but it certainly has no application in the present context of an individual under arrest in the county jail. *See* 35 Geo. L.J. Ann. Rev. Crim. Proc. 166 (2006) ("A prison inmate is in custody for *Miranda* purposes only if subjected to undue restraint on his or her freedom during interrogation.") (citing cases).

The cases cited by the majority, when examined closely, either involve general "on the scene questioning," an exception to the *Miranda* rule, *see Miranda v. Arizona*, 384 U.S. at 477, 86 S.Ct. 1602 ("General on-the-scene questioning as to the facts surrounding a crime . . . is not affected by our holding."), or situations in which the statement was given voluntarily or under the emergency doctrine.

It is also certainly true that, given the evidence before the trial court at the time it ruled, any reasonable trial court would have necessarily concluded that appellant had satisfied his burden of establishing that Powell had subjected him to "interrogation" for purposes of receiving *Miranda* warnings. Even assuming, for the sake of argument, that the Fifth Amendment does not require that we impute what Tedford and Garza knew to Powell, Powell himself testified that Tedford gave him "a brief rundown" of what he knew; that he (*i.e.,* Powell) knew that appellant, a young adult male, was "involved" in the interracial brawl; and that he went to the jail for the purpose of questioning appellant about that brawl. Given what he knew at the time he questioned appellant, Powell should have known that appellant was, at the very least, a potential suspect and that questioning him was reasonably likely to elicit an incriminating response.

Appellant argues that the court of appeals's holding, that his questioning by police while incarcerated in jail was not a custodial interrogation, conflicts with *Mathis v. United States*, 391 U.S. 1, 88 S.Ct. 1503, 20 L.Ed.2d 381 (1968), and *Jones v. State*, 119 S.W.3d 766 (Tex.Crim. App.2003). In *Mathis*, the Government argued that the *Miranda* warnings were inapplicable because Mathis "had not been put in jail by the officers questioning him, but was there for an entirely separate offense." *See* 391 U.S. at 4, 88 S.Ct. 1503. The State in the present case makes the same argument and has persuaded both the court of appeals and the majority of this Court. As the *Mathis* Court clearly stated, however, the "differences" suggested by the Government were "too minor and shadowy to justify a departure from the well-considered conclusions of *Miranda* with reference to warnings to be given to a person held in custody." *Ibid.* Thus, the Court noted, "We find *nothing* in the *Miranda* opinion which calls for a curtailment of the warnings to be given persons under interrogation by officers *based on the reason why the person is in custody.*" *Ibid.* (emphasis added). Indeed, the majority of this Court has quoted precisely this statement from *Mathis*, *see Herrera*, 241 S.W.3d at 527, to note that *Mathis* "appear[s] to be dispositive of the issue before us." *Id.* (emphasis added). But then the majority proceeds to conclude otherwise in light of a majority of federal cases decided after *Mathis*.

In *Jones*, appellant was arrested for outstanding traffic warrants and for possession of a controlled substance on the same day that his great aunt's body was discovered. The police officer who interrogated him for this murder repeatedly read him his *Miranda* rights and obtained a valid waiver before obtaining any statements from him. Jones did not object to the

admission of the statement obtained by this officer. Rather, the issue before this Court was the validity of the statement about two other murders that another officer obtained from Jones without informing him of his *Miranda* rights until after he had already questioned him and transcribed his answers.

We held in *Jones* that "[t]he failure to *Mirandize* [Jones] before interrogating him led to constitutional error in the admission of his written statement at trial." *Jones,* 119 S.W.3d at 772. We supported this conclusion by an examination of the "'the surrounding circumstances and the *entire course of police conduct* with respect to [Jones] in evaluating the voluntariness' of [his] written statement." *Id.* at 773 (emphasis added) (footnote omitted). We also noted that *"Miranda ... indisputably requires* a law enforcement agent to give the appropriate legal warnings *before* any questioning or 'discussion interview,' not merely *prior to signing a written* statement after all the *custodial interrogation* is complete." *Id.* at 775 fn. 16 (emphasis added). Thus, we held that Jones was "clearly in custody for purposes of *Miranda* when he gave the [contested] statement." *Id.* at 776 (citing *Cooks v. State,* 844 S.W.2d at 734).

The majority of this Court uses the facts in *Jones* to show that a similar decision would not be justified in the present case, even though the record in *Jones* was far more detailed than that available in this case. Moreover, our decision in *Jones* was not based solely on the facts of that case. We punctuated our conclusion by citing *Cooks v. State,* 844 S.W.2d at 734. *See Jones,* 119 S.W.3d at 776 & fn. 25. In *Cooks,* we had clearly stated that appellant had "pointed to *no evidence* supporting his contention that [his] statements were the product of custodial interrogation." 844 S.W.2d at 734. Nevertheless, we conclud-

ed that, "[c]*learly, while incarcerated* in the Dallas County Jail, [Cooks] *was* 'in custody.'" *Id.* (emphasis added). Thus, unlike the majority's holding in the present case, we did *not require* Cook to prove that he was "in custody" and held that he was, even though there was no evidence to prove it other than the fact that he was in jail. Moreover, our citation to *Cooks,* in *Jones,* for this precise proposition reaffirmed our approach in *Cooks.* Yet, the majority of this Court fails to explain its deviation from that approach in the present case.

The majority holds that appellant must show added limitations on his freedom, beyond the fact that he is under formal arrest, before he is "in custody." I find this amazing and in direct conflict with United States Supreme Court case law. *See California v. Beheler,* 463 U.S. at 1125, 103 S.Ct. 3517; *Mathis v. United States,* 391 U.S. at 4–5, 88 S.Ct. 1503. Obviously, the officer, in going to the jail, had to either take appellant out of the jail cell or interview him in the cell. Either way, from appellant's standpoint, he would have felt compelled to yield to the authority of the investigator if he had not been given the *Miranda* warnings. *See Berkemer v. McCarty,* 468 U.S. 420, 442, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984).

In short, I conclude that the record does not support the trial court's implicit decision that appellant did not meet his burden of establishing "custodial interrogation" for purposes of receiving the *Miranda* warnings. I respectfully dissent.