Opinion issued February 7, 2008 
















In The

Court of Appeals

For The

First District of Texas






NO. 01-07-00590-CR

__________


MICHAEL EUGENE SMITH, Appellant


V.


THE STATE OF TEXAS, Appellee






On Appeal from the 174th District Court

Harris County, Texas

Trial Court Cause No. 1081579






MEMORANDUM OPINION

 After the trial court denied the motion to suppress evidence of appellant,
Michael Eugene Smith, he pleaded guilty to the offense of possession of a controlled
substance, namely methamphetamine, in an amount more than 200 grams but less
than 400 grams. (1) Appellant also pleaded true to the allegations in two enhancement
paragraphs that he had twice been previously convicted of felony offenses. Pursuant
to appellant's plea agreement with the State, the trial court assessed appellant's
punishment at confinement for 30 years. In two points of error, appellant contends
that the trial court erred in denying his motion to suppress evidence as he did not
voluntarily consent to a search of his residence and in not excluding his statements
made to police officers that he had methamphetamine in his residence as they were
the product of a custodial interrogation. 

 We affirm. Factual Background

 In his motion to suppress evidence, appellant asserted that he was "arrested and
searched without a valid warrant and/or probable cause and exigent circumstances,"
in violation of the Fifth and Fourteenth Amendments to the United States
Constitution (2) and article 1, section 9 of the Texas Constitution. (3) He further asserted
that the use of any illegally obtained evidence violated Texas Code of Criminal
Procedure article 38.23. See Tex. Code Crim. Proc. Ann. art. 38.23 (Vernon 2005). 
 At the hearing on appellant's motion, Houston Police Officer Frank Scoggins
testified that he had previously received information from a confidential source that
appellant was selling methamphetamine and that he had methamphetamine concealed
in his house. Scoggins conducted surveillance of appellant for several days. One
morning, appellant left his house, drove to a business a few blocks way, and walked
inside the business. In an attempt to avoid divulging his confidential source,
Scoggins and other officers "decided to confront appellant and see if he would
cooperate in the investigation with [them]." The officers approached appellant inside
the business, identified themselves, asked appellant to "step aside and talk to [them],"
and told appellant that they had information that he was selling methamphetamine. 
Appellant, who was "free to leave" and "not under arrest," agreed to cooperate,
stepped to the side of the service counter, and admitted that he had five ounces of
methamphetamine in his house. Appellant told the officers that he wanted "to leave
his son and wife out of" the investigation, which the officers agreed to do. After
appellant agreed to sign a consent to search his house, the officers and appellant left
the business. The officers gave appellant a consent form, and he read the consent
form, confirmed he understood it, and signed it. Appellant then rode to his house in
a car driven by another officer, and Scoggins drove appellant's van to appellant's
house. Scoggins explained that the officers did not threaten or handcuff appellant and
he was "not under arrest." 

 The State introduced into evidence the "voluntary consent for search and
seizure," in which appellant stated that he gave consent to Officer Scoggins and
Officer Fred Wood to search his house, he understood that he had "the right to refuse
to give this consent," and that "no promises, threats, force, physical nor mental
coercion" had been used against him. After arriving at appellant's house, Scoggins,
Wood, and other officers followed appellant inside. Appellant led the officers into
the bedroom, where appellant recovered and unlocked a lock box, which contained
methamphetamine and cash. 

 On cross-examination, Scoggins explained that none of the officers were in
uniform or marked cars at the time that they confronted appellant. He denied
threatening appellant or his family and maintained that appellant was not under arrest
until after appellant showed him the methamphetamine. Although Scoggins stated
that "after [appellant] told me that he had five ounces, he wasn't going to walk away,"
he explained that he might have then gone to get a search warrant if appellant had not
cooperated. Appellant would have been "free to go" even after he admitted to having
the five ounces. Although the officers "patted down" appellant for weapons, no
officer "held" appellant as he and the officers exited the business. Scoggins kept his 
weapon concealed, and although one of the five officers may have been wearing a
police vest, none of the others did. Scoggins conceded that the officers did not
inform appellant of his legal rights. 

 Houston Police Officer Fred Wood testified that after he, Officer Scoggins, and
Officer Cargill questioned appellant inside the business for a few minutes, the officers
and appellant went outside, appellant admitted to having several ounces of
methamphetamine at his house, and appellant cooperated and signed a form in which
he consented to the search of his house. Wood explained that appellant was not
handcuffed or under arrest as they drove back to his house. When the officers and
appellant arrived at appellant's house, appellant took the officers inside to a bedroom
and opened a lock box, which contained methamphetamine and cash. On cross-examination, Wood agreed that when the officers approached appellant at the
business, there were three officers standing near appellant and there were other
officers who were probably inside the business. He noted that appellant was not
under arrest and none of the officers touched appellant as they left the business. 
When asked whether appellant was "free to leave," Wood stated that it was
Scoggins's decision and Wood was not privy to Scoggins's entire conversation with
appellant. Wood explained that appellant was asked to ride with the officers to his
house in accord with the officers' preferred practice under the circumstances. He
noted that appellant was arrested and advised of his legal rights after appellant
revealed the methamphetamine. 

 Houston Police Officer Cargill testified that he and Officer Scoggins
approached appellant inside a business, Scoggins told appellant that they had been
conducting an investigation, and the group stepped outside. Appellant admitted to
having five ounces of methamphetamine inside his house and agreed to allow the
officers to search his house. Cargill stated that appellant, who was not under arrest
and not threatened, read and signed the consent form voluntarily, rode with Cargill
back to appellant's house, led the officers to the bedroom, and unlocked a box
containing methamphetamine. On cross-examination, Cargill denied holding
appellant or telling appellant that he "could do this the hard way or the easy way." 
Cargill explained that after appellant admitted to possessing five ounces of
methamphetamine, the officers probably would not have released appellant. He noted
that the officers had "detained" appellant and asked for his consent to search the
house. Cargill agreed that appellant was not allowed to drive his own car to his house
and that one of the officer's had taken appellant's car keys.

 In contrast to the officers' testimony, appellant testified that, as he stood inside
the business, Officer Scoggins grabbed his elbow, showed him a badge, and told him
to come outside to talk. Four or five police officers, one of whom was wearing a
police vest, took him outside, and they were yelling. Officer Scoggins, who still had
appellant by the elbow, said, "We're going to do this the hard way or the easy way." 
Appellant stated that this encounter lasted about ten minutes. The officers then took
all of appellant's personal property without his permission, including his wallet and
keys. The officers were "all around appellant," appellant was not free to leave, and
he felt that he was under arrest. Appellant denied admitting that he had
methamphetamine in his house. The officers told appellant that he would either sign
the consent form or they would go to appellant's house, "tear it up," and "take
everybody to jail." Appellant explained that he was in fear for his family because the
officers threatened them with arrest. 

 Appellant further testified that he could see the officers' guns and one of the
officers had his hand on his gun as he told appellant to sign the consent form. The
officers did not allow him to read the consent form, they did not explain it to him, and
he signed it under duress. Appellant stated that one of the officers had his gun and
badge showing during the incident, but appellant agreed that none of the officers ever
pointed a gun at him. When appellant and the officers arrived at appellant's house,
the officers asked appellant's son to open the door, and his son refused. Appellant
cooperated, let the officers in, and subsequently opened the lock box containing the
methamphetamine. 

 Barry Ransom, an acquaintance who went to school with appellant, testified
that as he drove up to the business, he saw appellant coming out of the business with
several police officers, and appellant looked frightened. The officers had a "grip" on
appellant, and Ransom thought appellant had been arrested. As he drove by, Ransom
heard one of the officers say, "We can do this the hard way or the easy way," and he
heard appellant profess his innocence.

 The trial court denied the motion to suppress. 

Standard of Review

 In reviewing a trial court's ruling on a motion to suppress evidence, our
standard of review is bifurcated: we give almost total deference to a trial court's
determination of historical facts and review de novo the court's application of the
law. Maxwell v. State, 73 S.W.3d 278, 281 (Tex. Crim. App. 2002). At a suppression
hearing, the trial court is the sole and exclusive trier of fact and judge of the
witnesses' credibility. Maxwell, 73 S.W.3d at 281. Accordingly, the trial court may
choose to believe or to disbelieve all or any part of a witness's testimony. State v.
Ross, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000). We review the evidence in the
light most favorable to the trial court's ruling, and when, as here, the trial court fails
to make explicit findings of fact, we imply fact findings that support the trial court's
ruling so long as the evidence supports these implied findings. Gutierrez v. State,
221 S.W.3d 680, 687 (Tex. Crim. App. 2007). 

Consent

 In his first point of error, appellant argues that the trial court erred in denying
his motion to suppress evidence "because the consent to search form was not
executed voluntarily." Appellant asserts that the actions of the officers "amounted
to duress or coercion." Appellant notes that five officers confronted and surrounded
appellant, all were armed, and one had a jacket stating "police," thus making an
"overwhelming display of police authority."

 The Fourth Amendment grants individuals "the right . . . to be secure in their
persons, houses, papers, and effects, against unreasonable searches and seizures." 
U.S. Const. amend. IV. There is a "strong preference for searches to be administered
pursuant to a warrant," and "the search of a residence without a judicially authorized
warrant is presumptively unreasonable." Gutierrez, 221 S.W.3d at 685. However,
consent, when voluntarily given, provides an exception to the warrant requirement. 
Id. at 686. "The validity of a consensual search is a question of fact, and the State
bears the burden to prove by clear and convincing evidence that consent was obtained
voluntarily." Id. This burden includes proving that consent was not the result of
duress or coercion. Id. In determining if the State has met its burden, we examine the
totality of the circumstances. Id. at 686-87. 

 Here, Officer Scoggins testified that because a confidential source informed
him that appellant was selling and concealing methamphetamine, he and several other
officers approached appellant inside a business to seek appellant's cooperation. 
Appellant agreed to talk, admitted to having five ounces of methamphetamine, and
asked the officers to leave his family out of the investigation. The officers agreed to
appellant's request, and appellant consented to the search of his house. After the
officers and appellant exited the business, the officers gave appellant a consent to
search form. Although the officers conducted a "pat down" of appellant for weapons,
he was never restrained or threatened, and the officers' weapons were concealed. 
Only after appellant had read the consent form, which stated that he had the right to
refuse consent, appellant confirmed that he understood it and signed it. Appellant
then traveled in an officer's car to appellant's house, and Officer Scoggins drove
appellant's van to the house. Upon arrival, appellant led the officers to a bedroom
where he revealed his methamphetamine. 

 Officers Wood and Cargill offered consistent testimony, especially in regard
to the consent issue. Wood testified that he and the other officers questioned
appellant inside the business for a few minutes, the officers and appellant exited,
appellant admitted to having several ounces of methamphetamine at his house, and
appellant signed the consent to search his house. When the officers and appellant
arrived at appellant's house, appellant led the officers to a bedroom where he revealed
his methamphetamine. Wood confirmed that none of the officers held appellant as
they exited the business and that appellant was not under arrest until after showing
them the methamphetamine. Cargill testified that he and Scoggins approached
appellant inside a business, all the men stepped outside, appellant admitted to having
five ounces of methamphetamine inside his house, appellant consented to a search of
his house, and appellant read and signed the consent form voluntarily. Cargill denied
holding or threatening appellant. 

 Although appellant offered conflicting testimony supporting his assertion that
he consented to the search under duress or coercion, we presume that the trial court
resolved the disputed testimony against him. See id. at 687. Reviewing the evidence
in the light most favorable to the trial court's ruling, we hold that the State satisfied
its burden of presenting clear and convincing evidence that appellant's consent was
obtained voluntarily. Accordingly, we further hold that the trial court did not err in
denying appellant's motion to suppress evidence. (4)

 We overrule appellant's first point of error.

Custodial Interrogation

 In his second point of error, appellant argues that the trial court erred "in not
excluding statements made by appellant, including his statements concerning how
much methamphetamine was at appellant's house and the consent form, because they
were the product of custodial interrogation and no Miranda (5) warnings were given." 
Appellant asserts that he was actually under arrest "from the time the officers told him
they knew he was concealing methamphetamine inside his house." Appellant further
asserts that he was surrounded by the officers and that a reasonable person in his
position would not have felt free to leave. 

 The Fifth Amendment to the United States Constitution provides that no person
"shall be compelled in any criminal case to be a witness against himself[.]" U.S.
Const. amend. V. "Informing an accused of his legal rights "safeguard[s] an
uncounseled individual's constitutional privilege against self-incrimination during
custodial interrogation." Herrera v. State, No. PD-1986-05, 2007 WL 4146707, at
*3 (Tex. Crim. App. 2007). "[C]ustodial interrogation" is "questioning initiated by
law enforcement officers after a person has been taken into custody or otherwise
deprived of his freedom of action in any significant way." Id. (citing Miranda v.
Arizona, 384 U.S. 436, 444, 86 S. Ct. 1602, 1612 (1966). When determining custody
for Miranda purposes, we apply a reasonable person standard. Id. Thus, a person is
in custody only if, under the circumstances, a reasonable person would believe that
his freedom of movement was restrained to the degree associated with a formal
arrest. (6) Id. 

 The defendant bears the initial burden of proving that a statement was the
product of custodial interrogation. Herrera, 2007 WL 4146707, at *4. The State has
no burden unless the record as a whole clearly establishes that the defendant's
statement was the product of custodial interrogation by an agent for law enforcement. 
Id. A trial court's custody determination presents a mixed question of law and fact,
and we afford almost total deference when questions of historical fact turn on
credibility and demeanor. Id. Conversely, when questions of historical fact do not
turn on credibility and demeanor, we will review a trial court's custody determination
de novo. Id. 

 Here, viewing the evidence in the light most favorable to the trial court's
ruling, we conclude that the trial court could have reasonably concluded that
appellant was not subjected to a custodial interrogation. The officers testified that
they approached appellant inside a business, sought appellant's cooperation in the
methamphetamine investigation, and appellant immediately agreed to cooperate. 
Appellant then admitted to possessing a small amount of methamphetamine and
consented to a search of his house, possibly in exchange for the officer's agreement
to his request to leave his family out of the investigation. According to the officers,
they never threatened or restrained appellant in any way during this incident. 
Accordingly, we hold that the trial court did not err in not excluding appellant's
admission that he had methamphetamine in his house and his consent to a search of
his house. (7)

 We overrule appellant's second point of error.Conclusion

 We affirm the judgment of the trial court.


 

 Terry Jennings

 Justice


Panel consists of Chief Justice Radack and Justices Jennings and Bland.


Do not publish. See Tex. R. App. P. 47.2(b).

1. See Tex. Health & Safety Code Ann. § 481.115 (Vernon 2003). 
2. See U.S. Const. amends. V, XIV.
3. See Tex. Const. art. I, § 9.
4. In support of his position on appeal, appellant relies on Carmouche v. State, 10
S.W.3d 323 (Tex. Crim. App. 2000). In Carmouche, a videotape provided
"indisputable visual evidence contradicting essential portions" of the testimony of an
officer who alleged that the appellant consented to a search. Id. at 332. As
established by the videotape, "appellant was closely surrounded by four police
officers who had him backed up against the hood of his car," "[o]fficers told appellant
to turn around and put his hands on the car," and "[o]nly after appellant had assumed
such position, and as [the officer] was reaching for appellant's pants, did [the officer]
'ask,' 'Mind if I pat you down again?" Id. Additionally, "appellant was never told
during this exchange that he had a right to refuse consent" and appellant had already
been voluntarily searched in an earlier frisk. Id. at 332-33. The court concluded that
"a reasonable person would not have felt they had the choice to withhold consent to
search" and, thus, appellant's consent was not voluntary. Id. at 333. Here, there is
no evidence, other than appellant's testimony, contradicting the officers' testimony. 
Crediting the officers' testimony, a reasonable person in appellant's position would
have felt that he had a choice to withhold his consent at the time the officers
approached him.
5. See Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602 (1966).
6. Additionally, in Texas, certain requirements for admitting an accused's oral and
written statements must be met when those statements are made as a result of a
"custodial interrogation." See Tex. Code Crim. Proc. Ann. art. 38.22 (Vernon 2005). 
However, a statement that does not stem from custodial interrogation does not have
to meet these requirements. Id. art. 38.22 § 5 (Vernon 2005) (noting that nothing in
article "precludes the admission of . . . statement that does not stem from custodial
interrogation"). 
7. In regard to appellant's complaints that the officers did not provide him Miranda warnings before obtaining his consent, "we know of no authority that requires
informing a suspect of his rights under Miranda before obtaining a consent to search." 
See Rayford v. State, 125 S.W.3d 521, 528 (Tex. Crim. App. 2003).