COURT
OF APPEALS

                                       SECOND
DISTRICT OF TEXAS

                                                   FORT
WORTH

 

 

                                        NO.
2-07-449-CR

 

 

DERRICK LANARD FORD                                                       APPELLANT

 

                                                   V.

 

THE STATE OF TEXAS                                                                STATE

 

                                              ------------

 

        FROM CRIMINAL
DISTRICT COURT NO. 2 OF TARRANT COUNTY

 

                                              ------------

 

                                MEMORANDUM OPINION[1]

 

                                              ------------

 

                                          I.  INTRODUCTION

Appellant Derrick Lanard Ford appeals his
conviction for murder.  In a single
issue, Ford argues that the trial court erred by admitting his oral confession
because it did not comply with the requirements of article 38.22 of the Texas
Code of Criminal Procedure.  We will
affirm.








                                    II.  FACTUAL BACKGROUND

On August 10, 2000, Billy Teel died after
suffering a subdural hematoma as the result of being pushed out of a moving
vehicle.  The two men who had been in the
truck with Teel fled from the scene of the crime.  A ball cap was recovered near the scene of
the crime, but no one was arrested in connection with Teel=s
murder.

Almost six years later, Officer Matthew Hardy, an
officer with the City of Fort Worth Police Department, was assigned the cold
case.  He obtained a search warrant to
collect a buccal swab from Ford so that he could compare it to DNA from the
ball cap that had been recovered in 2000. 
Officer Hardy attempted to locate Ford and eventually found that he was
living with his sister at a mobile home park. 
Officer Hardy had a telephone conversation with Ford and eventually met
him at the mobile home park where Ford was living.

Ford moved to suppress the conversation that took
place during that meeting, and the trial court held a hearing on Ford=s motion
to suppress.  The following is the
testimony given at the suppression hearing.

A.     Officer Hardy=s
Version of the Events








When Officer Hardy arrived at Ford=s sister=s, Ford=s niece
or another female relative answered the door. 
Ford later came out and talked with Officer Hardy on the porch.[2]  Officer Hardy told Ford that he needed to
execute a search warrant for a buccal swab and that Ford was not under
arrest.  Ford asked what this was about,
and Officer Hardy explained that it was in reference to an investigation of an
event that had happened several years ago and said that he would answer Ford=s
questions after he executed the search warrant. 
Officer Hardy asked Ford to step into his unmarked police vehicle so he
could execute the search warrant without the buccal swab being
contaminated.  Ford complied by getting
in the car.

After Officer Hardy obtained the buccal swab from
Ford, Officer Hardy explained that the investigation was in reference Ato a man
who had come out of a vehicle@ about
six years ago.  Ford immediately began
talking.  He said that he did not mean to
hurt the man.  Officer Hardy asked what
had happened, and Ford continued by telling Officer Hardy that 








he and another person
named David Jackson had met this -- or had -- had observed this man walking
towards a truck in some apartments west of Como, past the Ridglea area of Fort
Worth, and that he had a weapon with him and he described . . . that it was the
weapon that he later got arrested with later that morning on the day of the
offense.  And he said that they were
going to jack the man, which means, based on my experiences, to rob the man,
and that they did not intend to hurt him. 
That [Ford=s] car had broken down
and he only wanted to get a ride home, he had no money.

 

. . . .

 

And so they got into the car --
into the truck and stated that the -- the man was driving.  He described him as an older, white
male.  He said that David Jackson was in
the middle seat, in the front seat, and that he was on the far right side in
the front seat on the passenger side. 
And stated that they were going down the road and the man was talking
like ADon=t hurt
me.  I=ve got a
family.@  And that they were telling him AWe=re not
going to hurt you.  We just want your
truck.@  And then the man came out of the truck. 

Ford told Officer Hardy that the man came out of the truck after Ford
displayed a weapon. 

After Ford told Officer Hardy this information,
Officer Hardy asked Ford if he would agree to provide an audiotaped
statement.  Ford said that he did not
know whether or not he wanted to give his statement without an attorney, and
Officer Hardy responded that it was his right to have an attorney.  Ford thereafter kept saying that he did not
mean for the man to get hurt.  And then
Ford agreed to make his statement.  He
asked whether David Jackson had admitted being involved in any way and stated, AI would
never hurt anybody.  I might threaten,
but I would never hurt anybody.@  During the taping, Ford equivocated on
whether he should have an attorney. 
Officer Hardy ultimately pushed Ford to make a decision, and Ford said
that he wanted an attorney.








Officer Hardy told Ford that the investigation
would continue, and Ford left the vehicle and walked toward the house.  Officer Hardy testified that he did not smell
any alcohol on Ford as he talked to him, nor did Ford appear to exhibit any
signs of intoxication.  Officer Hardy
also stated that Ford was not ever under arrest during the entire time that
they were in the car, that the doors of the unmarked car were not locked, that
Ford was never handcuffed, that Ford was seated in the front of the vehicle
with Officer Hardy, that Ford was never detained, that Ford was never
threatened with a weapon or verbally, that Ford was never promised anything,
and that Ford never asked to leave.  Ford
was not arrested until January 12, 2007.

B.     Ford=s
Version of the Events

Ford also testified at the suppression
hearing.  He had been arrested in August
2000 for unlawfully carrying a weapon and had been taken to a line up where he
asserted his right to an attorney and did not make a statement.








Six years passed, and Ford received a telephone
call in December 2006 from Officer Hardy, stating that he wanted to show Ford
some pictures.  Ford said that he asked
Officer Hardy what it was about and told him that he did not Awant to
be a part of anything.@ 
Ford said that it was a bad time because he was watching his niece and nephew
and that Officer Hardy left him no choice but to meet with him because Officer
Hardy said that he was right around the corner.

After Ford got off the phone, he went outside to
smoke a cigarette, and Officer Hardy was sitting in his vehicle outside Ford=s
home.  Ford stood on the porch and smoked
a cigarette while Officer Hardy sat in his vehicle.  When Officer Hardy left his vehicle and
approached Ford, Officer Hardy asked Ford to Acome and
get in the car@ so that Officer Hardy could
show Ford some pictures.  Ford told
Officer Hardy that he did not feel comfortable getting in the car.  Ford also said that he wanted a lawyer.[3]  Officer Hardy told Ford that he had a search
warrant for the swab.  Ford asked to see
the search warrant, and Officer Hardy showed it to him.  Ford thereafter agreed to comply with the
search warrant and asked if the swab could be done in the house.  Officer Hardy told Ford to come to his car so
that he could get a Abetter testing because out here
it=s real
airy.@  Ford ultimately went to the car. 

Ford testified that Officer Hardy told him that
he was not under arrest, and Ford said that he felt like he was free to leave
while he was outside the car.  When
Officer Hardy started questioning Ford, he felt like Officer Hardy Awas
trying to hold [him],@ so Ford kept telling him that
he wanted his attorney.








Ford=s
attorney asked him what transpired after he sat down in the car, and Ford said
that Officer Hardy gave him Athe Miranda
right papers@ and said that he needed to go
through them before he gave Ford the test. 
Ford said that he did not feel like he could leave at that point.  He said that Officer Hardy questioned him
about people he knew.  Ford answered
those questions but eventually stopped because he felt like Officer Hardy was Atrying
to get [him] in trouble for something [he had not] even done.@  Ford testified that he was never shown any
pictures, that he did not make any of the declarations that Officer Hardy
testified about, and that he had asked for an attorney before Officer Hardy
turned on the tape recorder.  Ford stated
that Officer Hardy never mentioned anything about a robbery and possible
homicide that was committed in August 2000.

At the end of the audiotaped conversation, Ford
asked if he could leave, and Officer Hardy told him that he could.  Ford asked Officer Hardy to Apop the
lock@ because
the door was locked, but Ford admitted that he did not know that the door was
locked until he was ready to leave.








Ford said that he was Ahighly
intoxicated@ that day because he had been
drinking brandy for Aa good couple of hours.@  Ford told Officer Hardy that he had been
drinking and asked him if it would affect the swab.  In spite of his alleged intoxicated state,
Ford admitted that he knew what was going on and that he was capable of taking
care of his sister=s children.

On cross-examination, Ford reiterated that
Officer Hardy had told him that he was not under arrest.  Ford, however, said that he felt pressured
when Officer Hardy started talking.  Ford
admitted that he was not handcuffed, that he had free use of his hands, that he
had not been patted down, and that he had not been treated in any way like he
was under arrest.[4]  Ford was adamant that he did not say any of
the things that Officer Hardy mentioned. 
The State replayed the portion of the audiotape in which Ford said, AHave you
talked to David, man, he must have said he had something to do with it.@  Ford tried to explain his statement by saying
that Officer Hardy had started pressuring him and had mentioned that Atype of
stuff.@  The prosecutor then questioned Ford about the
consistency of his statement on the tape with what Officer Hardy had testified:

Q. [Prosecutor:] Matt Hardy says that you admitted to a robbery but said
you didn=t mean to hurt the
man.  What you said there is consistent
with what he says you said, that you threatened the man when you robbed him,
but you didn=t mean to hurt him.  Isn=t that consistent?

 








A.  No, it=s not.  Because that had nothing to do with -- the
man never did even question me about that stuff.  He was talking to me about some stuff and
some robberies that had been going on in the area.  That=s why I said that about
David. 

 

Due to the detailed testimony Ford gave, the prosecutor ultimately
asked Ford whether he had a pretty good recollection of the circumstances that
had occurred inside the car, and he replied, ANot
really.@

C.     Outcome of the Suppression Hearing

After hearing the above testimony, as well as
testimony from Ford=s wife that Ford=s voice
on the tape sounded like he was intoxicated, the trial court stated,

All right.  Defendant=s Motion to Suppress the
statement falls under 38.22.  And
specifically 38.22, Section 3 (a), where it states:  No oral or signed language statement of an
accused made at a custodial interrogation shall be admissible against an
accused in a criminal proceeding unless there=s an electronic recording
or motion picture videotape, et cetera.

 

The crucial language of 38.22 Section 3 (a) is, of course, custodial
interrogation.  And the Court must first
find that the Defendant, Mr. Ford, was in custody.  Based upon the testimony of both Mr. Ford and
Officer Hardy, the Court=s going to find that Mr.
Ford was not in custody at the time that he gave a statement.  Therefore, 38.22 does not fall into play.

 

The trial court thereafter denied Ford=s motion
to suppress.








D.     The Evidence at Trial

Officer Hardy gave testimony at trial similar to
the testimony that he gave at the suppression hearing.  Additional evidence elicited at trial
corroborated Ford=s statements that he had
committed the offense with David Jackson because a witness identified Jackson
and because the results from Jackson=s DNA
sample revealed that he could not be excluded as a match for the DNA found on
the cap. 

E.     The Verdict

After hearing the evidence, the jury found Ford
guilty of murder and recommended a punishment of twenty years=
confinement.  The trial court sentenced
Ford in accordance with the jury=s
recommendation, and this appeal followed.

                                     III.  STANDARD OF REVIEW








We review a trial court=s ruling
on a motion to suppress evidence under a bifurcated standard of review.  Amador v. State, 221 S.W.3d 666, 673
(Tex. Crim. App. 2007); Guzman v. State, 955 S.W.2d 85, 89 (Tex. Crim.
App. 1997).  In reviewing the trial court=s
decision, we do not engage in our own factual review.  Romero v. State, 800 S.W.2d 539, 543
(Tex. Crim. App. 1990); Best v. State, 118 S.W.3d 857, 861 (Tex. App.CFort
Worth 2003, no pet.).  The trial judge is
the sole trier of fact and judge of the credibility of the witnesses and the
weight to be given their testimony.  Wiede
v. State, 214 S.W.3d 17, 24B25 (Tex.
Crim. App. 2007); State v. Ross, 32 S.W.3d 853, 855 (Tex. Crim. App.
2000), modified on other grounds by State v. Cullen, 195 S.W.3d 696
(Tex. Crim. App. 2006).  Therefore, we
give almost total deference to the trial court=s
rulings on (1) questions of historical fact, even if the trial court=s
determination of those facts was not based on an evaluation of credibility and
demeanor, and (2) application‑of‑law‑to‑fact questions
that turn on an evaluation of credibility and demeanor.  Amador, 221 S.W.3d at 673; Montanez
v. State, 195 S.W.3d 101, 108B09 (Tex.
Crim. App. 2006); Johnson v. State, 68 S.W.3d 644, 652B53 (Tex.
Crim. App. 2002).  But when
application-of-law-to-fact questions do not turn on the credibility and
demeanor of the witnesses, we review the trial court=s
rulings on those questions de novo.  Amador,
221 S.W.3d at 673; Estrada v. State, 154 S.W.3d 604, 607 (Tex. Crim.
App. 2005); Johnson, 68 S.W.3d at 652B53.








Stated another way, when reviewing the trial
court=s ruling
on a motion to suppress, we must view the evidence in the light most favorable
to the trial court=s ruling.  Wiede, 214 S.W.3d at 24; State v.
Kelly, 204 S.W.3d 808, 818 (Tex. Crim. App. 2006).  When the trial court makes explicit fact
findings, we determine whether the evidence, when viewed in the light most
favorable to the trial court=s
ruling, supports those fact findings.  Kelly,
204 S.W.3d at 818B19.  We then review the trial court=s legal
ruling de novo unless its explicit fact findings that are supported by the
record are also dispositive of the legal ruling.  Id. at 819.

When the record is silent on the reasons for the
trial court=s ruling, or when there are no
explicit fact findings and neither party timely requested findings and
conclusions from the trial court, we imply the necessary fact findings that
would support the trial court=s ruling
if the evidence, viewed in the light most favorable to the trial court=s
ruling, supports those findings.  State
v. Garcia-Cantu, 253 S.W.3d 236, 241 (Tex. Crim. App. 2008); see
Wiede, 214 S.W.3d at 25.  We then
review the trial court=s legal ruling de novo unless
the implied fact findings supported by the record are also dispositive of the
legal ruling.  Kelly, 204 S.W.3d
at 819.

We must uphold the trial court=s ruling
if it is supported by the record and correct under any theory of law applicable
to the case even if the trial court gave the wrong reason for its ruling.  State v. Stevens, 235 S.W.3d 736, 740
(Tex. Crim. App. 2007); Armendariz v. State, 123 S.W.3d 401, 404 (Tex.
Crim. App. 2003), cert. denied, 541 U.S. 974 (2004).








                   IV.  ARTICLE 38.22 APPLIES ONLY TO STATEMENTS MADE

                               WHILE IN CUSTODIAL INTERROGATION

 

In his only issue, Ford argues that the trial
court erred by admitting his oral confession because it did not comply with the
requirements of article 38.22 of the Texas Code of Criminal Procedure.  The State responds that the trial court did
not abuse its discretion by overruling Ford=s motion
to suppress because Ford was neither in custody nor under interrogation when he
made the statements at issue.

Texas Code of Criminal Procedure article 38.22,
section 3(a)(1) states that A[n]o
oral or sign language statement of an accused made as a result of custodial
interrogation shall be admissible against the accused in a criminal proceeding
unless: (1) an electronic recording, which may include motion picture, video
tape, or other visual recording, is made of the statement.@  Tex. Code Crim. Proc. Ann. art. 38.22 (Vernon
2005).








When considering Acustody@ for Miranda
purposes, we apply a Areasonable person@
standardCA[a]
person is in >custody= only
if, under the circumstances, a reasonable person would believe that his freedom
of movement was restrained to the degree associated with a formal arrest.@  Herrera v. State, 241 S.W.3d 520, 525
(Tex. Crim. App. 2007) (also stating that A[o]ur
construction of >custody= for
purposes of Article 38.22 is consistent with the meaning of >custody= for
purposes of Miranda@).  Our Acustody@ inquiry
also includes an examination of all of the objective circumstances surrounding
the questioning.  Id.  The subjective belief of law enforcement
officials about whether a person is a suspect does not factor into our Acustody@
determination unless an official=s
subjective belief was somehow conveyed to the person who was questioned.  Id. at 525B26.








Here, the record reveals that Officer Hardy made
it clear that Ford was not under arrest, and Ford even testified that he knew
he was not under arrest.  Although Ford stated
that he did not feel that he was free to leave once he entered the vehicle,
there was no evidence to support his feeling: 
according to Officer Hardy, the doors of the unmarked car were not
locked, Ford was never handcuffed, Ford was seated in the front of the vehicle
with Officer Hardy, Ford was never patted down nor detained, Ford was never
threatened with a weapon or verbally, Ford was never promised anything, and
Ford never asked to leave.  According to
Officer Hardy, he was not interrogating Ford at the time that Ford made his
statement; instead, Ford made his unsolicited statement after Officer Hardy
explained what he was investigating. 
Reviewing the evidence in the light most favorable to the trial court=s ruling,
we hold that Ford was not in custody at the time he made his statement to
Officer Hardy.  See id.; Lopez
v. State, No. 02-02-00096-CR, 2003 WL 1849206, at *2B3 (Tex.
App.CFort
Worth Apr. 10, 2003, pet. ref=d) (mem.
op., not designated for publication) (holding that appellant was not in custody
when he made statements because he was not handcuffed, he was not under arrest,
he was told by officer that he was trying to ascertain appellant=s
identity, and appellant initiated conversation by asking what officer was
investigating.  The trial court,
therefore, did not err by denying Ford=s motion
to suppress.  We overrule Ford=s sole
issue.

                                          V.  CONCLUSION

Having overruled Ford=s sole
issue, we affirm the trial court=s
judgment.

 

SUE
WALKER

JUSTICE

 

PANEL: DAUPHINOT, WALKER,
and MCCOY, JJ.

 

DO NOT PUBLISH

Tex. R. App. P. 47.2(b)

 

DELIVERED: January 22,
2009











[1]See Tex. R. App. P. 47.4.





[2]Officer Hardy testified
that he did not want to talk to Ford inside the mobile home partly because of Aofficer safety@ and partly because he
wanted privacy so there would not be any interruptions.





[3]On redirect, Ford said
that the first time he mentioned wanting a lawyer was the first time Officer
Hardy came to the door of his house.





[4]Ford admitted that he
knew how the police treated people when they were under arrest because Ford had
been arrested approximately ten times.