

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

### NO. 2-07-449-CR

DERRICK LANARD FORD                                          APPELLANT

V.

THE STATE OF TEXAS                                                  STATE

------------

FROM CRIMINAL DISTRICT COURT NO. 2 OF TARRANT COUNTY

------------

## MEMORANDUM OPINION[1]

------------

### I. INTRODUCTION

Appellant Derrick Lanard Ford appeals his conviction for murder. In a single issue, Ford argues that the trial court erred by admitting his oral confession because it did not comply with the requirements of article 38.22 of the Texas Code of Criminal Procedure. We will affirm.

---

[1] *See* Tex. R. App. P. 47.4.

## II. FACTUAL BACKGROUND

On August 10, 2000, Billy Teel died after suffering a subdural hematoma as the result of being pushed out of a moving vehicle. The two men who had been in the truck with Teel fled from the scene of the crime. A ball cap was recovered near the scene of the crime, but no one was arrested in connection with Teel's murder.

Almost six years later, Officer Matthew Hardy, an officer with the City of Fort Worth Police Department, was assigned the cold case. He obtained a search warrant to collect a buccal swab from Ford so that he could compare it to DNA from the ball cap that had been recovered in 2000. Officer Hardy attempted to locate Ford and eventually found that he was living with his sister at a mobile home park. Officer Hardy had a telephone conversation with Ford and eventually met him at the mobile home park where Ford was living.

Ford moved to suppress the conversation that took place during that meeting, and the trial court held a hearing on Ford's motion to suppress. The following is the testimony given at the suppression hearing.

### A. Officer Hardy's Version of the Events

When Officer Hardy arrived at Ford's sister's, Ford's niece or another female relative answered the door. Ford later came out and talked with Officer

Hardy on the porch.[2]  Officer Hardy told Ford that he needed to execute a search warrant for a buccal swab and that Ford was not under arrest.  Ford asked what this was about, and Officer Hardy explained that it was in reference to an investigation of an event that had happened several years ago and said that he would answer Ford's questions after he executed the search warrant.  Officer Hardy asked Ford to step into his unmarked police vehicle so he could execute the search warrant without the buccal swab being contaminated.  Ford complied by getting in the car.

After Officer Hardy obtained the buccal swab from Ford, Officer Hardy explained that the investigation was in reference "to a man who had come out of a vehicle" about six years ago.  Ford immediately began talking.  He said that he did not mean to hurt the man.  Officer Hardy asked what had happened, and Ford continued by telling Officer Hardy that

> he and another person named David Jackson had met this -- or had
> -- had observed this man walking towards a truck in some
> apartments west of Como, past the Ridglea area of Fort Worth, and
> that he had a weapon with him and he described . . . that it was
> the weapon that he later got arrested with later that morning on
> the day of the offense.  And he said that they were going to jack
> the man, which means, based on my experiences, to rob the man,
> and that they did not intend to hurt him.  That [Ford's] car had

---

[2] Officer Hardy testified that he did not want to talk to Ford inside the mobile home partly because of "officer safety" and partly because he wanted privacy so there would not be any interruptions.

broken down and he only wanted to get a ride home, he had no money.

. . . .

And so they got into the car -- into the truck and stated that the -- the man was driving. He described him as an older, white male. He said that David Jackson was in the middle seat, in the front seat, and that he was on the far right side in the front seat on the passenger side. And stated that they were going down the road and the man was talking like "Don't hurt me. I've got a family." And that they were telling him "We're not going to hurt you. We just want your truck." And then the man came out of the truck.

Ford told Officer Hardy that the man came out of the truck after Ford displayed a weapon.

After Ford told Officer Hardy this information, Officer Hardy asked Ford if he would agree to provide an audiotaped statement. Ford said that he did not know whether or not he wanted to give his statement without an attorney, and Officer Hardy responded that it was his right to have an attorney. Ford thereafter kept saying that he did not mean for the man to get hurt. And then Ford agreed to make his statement. He asked whether David Jackson had admitted being involved in any way and stated, "I would never hurt anybody. I might threaten, but I would never hurt anybody." During the taping, Ford equivocated on whether he should have an attorney. Officer Hardy ultimately pushed Ford to make a decision, and Ford said that he wanted an attorney.

4

Officer Hardy told Ford that the investigation would continue, and Ford left the vehicle and walked toward the house. Officer Hardy testified that he did not smell any alcohol on Ford as he talked to him, nor did Ford appear to exhibit any signs of intoxication. Officer Hardy also stated that Ford was not ever under arrest during the entire time that they were in the car, that the doors of the unmarked car were not locked, that Ford was never handcuffed, that Ford was seated in the front of the vehicle with Officer Hardy, that Ford was never detained, that Ford was never threatened with a weapon or verbally, that Ford was never promised anything, and that Ford never asked to leave. Ford was not arrested until January 12, 2007.

## B. Ford's Version of the Events

Ford also testified at the suppression hearing. He had been arrested in August 2000 for unlawfully carrying a weapon and had been taken to a line up where he asserted his right to an attorney and did not make a statement.

Six years passed, and Ford received a telephone call in December 2006 from Officer Hardy, stating that he wanted to show Ford some pictures. Ford said that he asked Officer Hardy what it was about and told him that he did not "want to be a part of anything." Ford said that it was a bad time because he was watching his niece and nephew and that Officer Hardy left him no choice

5

but to meet with him because Officer Hardy said that he was right around the corner.

After Ford got off the phone, he went outside to smoke a cigarette, and Officer Hardy was sitting in his vehicle outside Ford's home. Ford stood on the porch and smoked a cigarette while Officer Hardy sat in his vehicle. When Officer Hardy left his vehicle and approached Ford, Officer Hardy asked Ford to "come and get in the car" so that Officer Hardy could show Ford some pictures. Ford told Officer Hardy that he did not feel comfortable getting in the car. Ford also said that he wanted a lawyer.[3] Officer Hardy told Ford that he had a search warrant for the swab. Ford asked to see the search warrant, and Officer Hardy showed it to him. Ford thereafter agreed to comply with the search warrant and asked if the swab could be done in the house. Officer Hardy told Ford to come to his car so that he could get a "better testing because out here it's real airy." Ford ultimately went to the car.

Ford testified that Officer Hardy told him that he was not under arrest, and Ford said that he felt like he was free to leave while he was outside the car. When Officer Hardy started questioning Ford, he felt like Officer Hardy "was trying to hold [him]," so Ford kept telling him that he wanted his attorney.

---

[3] On redirect, Ford said that the first time he mentioned wanting a lawyer was the first time Officer Hardy came to the door of his house.

Ford's attorney asked him what transpired after he sat down in the car, and Ford said that Officer Hardy gave him "the *Miranda* right papers" and said that he needed to go through them before he gave Ford the test. Ford said that he did not feel like he could leave at that point. He said that Officer Hardy questioned him about people he knew. Ford answered those questions but eventually stopped because he felt like Officer Hardy was "trying to get [him] in trouble for something [he had not] even done." Ford testified that he was never shown any pictures, that he did not make any of the declarations that Officer Hardy testified about, and that he had asked for an attorney before Officer Hardy turned on the tape recorder. Ford stated that Officer Hardy never mentioned anything about a robbery and possible homicide that was committed in August 2000.

At the end of the audiotaped conversation, Ford asked if he could leave, and Officer Hardy told him that he could. Ford asked Officer Hardy to "pop the lock" because the door was locked, but Ford admitted that he did not know that the door was locked until he was ready to leave.

Ford said that he was "highly intoxicated" that day because he had been drinking brandy for "a good couple of hours." Ford told Officer Hardy that he had been drinking and asked him if it would affect the swab. In spite of his

7

alleged intoxicated state, Ford admitted that he knew what was going on and that he was capable of taking care of his sister's children.

On cross-examination, Ford reiterated that Officer Hardy had told him that he was not under arrest. Ford, however, said that he felt pressured when Officer Hardy started talking. Ford admitted that he was not handcuffed, that he had free use of his hands, that he had not been patted down, and that he had not been treated in any way like he was under arrest.[4] Ford was adamant that he did not say any of the things that Officer Hardy mentioned. The State replayed the portion of the audiotape in which Ford said, "Have you talked to David, man, he must have said he had something to do with it." Ford tried to explain his statement by saying that Officer Hardy had started pressuring him and had mentioned that "type of stuff." The prosecutor then questioned Ford about the consistency of his statement on the tape with what Officer Hardy had testified:

> **Q.** [Prosecutor:] Matt Hardy says that you admitted to a robbery but said you didn't mean to hurt the man. What you said there is consistent with what he says you said, that you threatened the man when you robbed him, but you didn't mean to hurt him. Isn't that consistent?

---

[4] Ford admitted that he knew how the police treated people when they were under arrest because Ford had been arrested approximately ten times.

8

**A. No, it's not. Because that had nothing to do with -- the man never did even question me about that stuff. He was talking to me about some stuff and some robberies that had been going on in the area. That's why I said that about David.**

Due to the detailed testimony Ford gave, the prosecutor ultimately asked Ford whether he had a pretty good recollection of the circumstances that had occurred inside the car, and he replied, "Not really."

### C.    Outcome of the Suppression Hearing

After hearing the above testimony, as well as testimony from Ford's wife that Ford's voice on the tape sounded like he was intoxicated, the trial court stated,

> All right. Defendant's Motion to Suppress the statement falls under 38.22. And specifically 38.22, Section 3 (a), where it states: No oral or signed language statement of an accused made at a custodial interrogation shall be admissible against an accused in a criminal proceeding unless there's an electronic recording or motion picture videotape, et cetera.

> The crucial language of 38.22 Section 3 (a) is, of course, custodial interrogation. And the Court must first find that the Defendant, Mr. Ford, was in custody. Based upon the testimony of both Mr. Ford and Officer Hardy, the Court's going to find that Mr. Ford was not in custody at the time that he gave a statement. Therefore, 38.22 does not fall into play.

The trial court thereafter denied Ford's motion to suppress.

**D.    The Evidence at Trial**

Officer Hardy gave testimony at trial similar to the testimony that he gave at the suppression hearing.  Additional evidence elicited at trial corroborated Ford's statements that he had committed the offense with David Jackson because a witness identified Jackson and because the results from Jackson's DNA sample revealed that he could not be excluded as a match for the DNA found on the cap.

**E.    The Verdict**

After hearing the evidence, the jury found Ford guilty of murder and recommended a punishment of twenty years' confinement.  The trial court sentenced Ford in accordance with the jury's recommendation, and this appeal followed.

### III.  STANDARD OF REVIEW

We review a trial court's ruling on a motion to suppress evidence under a bifurcated standard of review.  *Amador v. State*, 221 S.W.3d 666, 673 (Tex. Crim. App. 2007); *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997).  In reviewing the trial court's decision, we do not engage in our own factual review.  *Romero v. State*, 800 S.W.2d 539, 543 (Tex. Crim. App. 1990); *Best v. State*, 118 S.W.3d 857, 861 (Tex. App.—Fort Worth 2003, no pet.).  The trial judge is the sole trier of fact and judge of the credibility of the

10

witnesses and the weight to be given their testimony. *Wiede v. State*, 214 S.W.3d 17, 24–25 (Tex. Crim. App. 2007); *State v. Ross*, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000), *modified on other grounds by State v. Cullen*, 195 S.W.3d 696 (Tex. Crim. App. 2006). Therefore, we give almost total deference to the trial court's rulings on (1) questions of historical fact, even if the trial court's determination of those facts was not based on an evaluation of credibility and demeanor, and (2) application-of-law-to-fact questions that turn on an evaluation of credibility and demeanor. *Amador*, 221 S.W.3d at 673; *Montanez v. State*, 195 S.W.3d 101, 108–09 (Tex. Crim. App. 2006); *Johnson v. State*, 68 S.W.3d 644, 652–53 (Tex. Crim. App. 2002). But when application-of-law-to-fact questions do not turn on the credibility and demeanor of the witnesses, we review the trial court's rulings on those questions de novo. *Amador*, 221 S.W.3d at 673; *Estrada v. State*, 154 S.W.3d 604, 607 (Tex. Crim. App. 2005); *Johnson*, 68 S.W.3d at 652–53.

Stated another way, when reviewing the trial court's ruling on a motion to suppress, we must view the evidence in the light most favorable to the trial court's ruling. *Wiede*, 214 S.W.3d at 24; *State v. Kelly*, 204 S.W.3d 808, 818 (Tex. Crim. App. 2006). When the trial court makes explicit fact findings, we determine whether the evidence, when viewed in the light most favorable to the trial court's ruling, supports those fact findings. *Kelly*, 204 S.W.3d at 818–19.

11

We then review the trial court's legal ruling de novo unless its explicit fact findings that are supported by the record are also dispositive of the legal ruling. *Id*. at 819.

When the record is silent on the reasons for the trial court's ruling, or when there are no explicit fact findings and neither party timely requested findings and conclusions from the trial court, we imply the necessary fact findings that would support the trial court's ruling if the evidence, viewed in the light most favorable to the trial court's ruling, supports those findings. *State v. Garcia-Cantu*, 253 S.W.3d 236, 241 (Tex. Crim. App. 2008); *see Wiede*, 214 S.W.3d at 25. We then review the trial court's legal ruling de novo unless the implied fact findings supported by the record are also dispositive of the legal ruling. *Kelly*, 204 S.W.3d at 819.

We must uphold the trial court's ruling if it is supported by the record and correct under any theory of law applicable to the case even if the trial court gave the wrong reason for its ruling. *State v. Stevens*, 235 S.W.3d 736, 740 (Tex. Crim. App. 2007); *Armendariz v. State*, 123 S.W.3d 401, 404 (Tex. Crim. App. 2003), *cert. denied*, 541 U.S. 974 (2004).

## IV. ARTICLE 38.22 APPLIES ONLY TO STATEMENTS MADE WHILE IN CUSTODIAL INTERROGATION

In his only issue, Ford argues that the trial court erred by admitting his oral confession because it did not comply with the requirements of article 38.22 of the Texas Code of Criminal Procedure. The State responds that the trial court did not abuse its discretion by overruling Ford's motion to suppress because Ford was neither in custody nor under interrogation when he made the statements at issue.

Texas Code of Criminal Procedure article 38.22, section 3(a)(1) states that "[n]o oral or sign language statement of an accused made as a result of custodial interrogation shall be admissible against the accused in a criminal proceeding unless: (1) an electronic recording, which may include motion picture, video tape, or other visual recording, is made of the statement." Tex. Code Crim. Proc. Ann. art. 38.22 (Vernon 2005).

When considering "custody" for *Miranda* purposes, we apply a "reasonable person" standard—"[a] person is in 'custody' only if, under the circumstances, a reasonable person would believe that his freedom of movement was restrained to the degree associated with a formal arrest." *Herrera v. State*, 241 S.W.3d 520, 525 (Tex. Crim. App. 2007) (also stating that "[o]ur construction of 'custody' for purposes of Article 38.22 is consistent

13

with the meaning of 'custody' for purposes of *Miranda*"). Our "custody" inquiry also includes an examination of all of the objective circumstances surrounding the questioning. *Id.* The subjective belief of law enforcement officials about whether a person is a suspect does not factor into our "custody" determination unless an official's subjective belief was somehow conveyed to the person who was questioned. *Id.* at 525–26.

Here, the record reveals that Officer Hardy made it clear that Ford was not under arrest, and Ford even testified that he knew he was not under arrest. Although Ford stated that he did not feel that he was free to leave once he entered the vehicle, there was no evidence to support his feeling: according to Officer Hardy, the doors of the unmarked car were not locked, Ford was never handcuffed, Ford was seated in the front of the vehicle with Officer Hardy, Ford was never patted down nor detained, Ford was never threatened with a weapon or verbally, Ford was never promised anything, and Ford never asked to leave. According to Officer Hardy, he was not interrogating Ford at the time that Ford made his statement; instead, Ford made his unsolicited statement after Officer Hardy explained what he was investigating. Reviewing the evidence in the light most favorable to the trial court's ruling, we hold that Ford was not in custody at the time he made his statement to Officer Hardy. *See id.*; *Lopez v. State*, No. 02-02-00096-CR, 2003 WL 1849206, at *2–3 (Tex.

14

App.—Fort Worth Apr. 10, 2003, pet. ref'd) (mem. op., not designated for publication) (holding that appellant was not in custody when he made statements because he was not handcuffed, he was not under arrest, he was told by officer that he was trying to ascertain appellant's identity, and appellant initiated conversation by asking what officer was investigating. The trial court, therefore, did not err by denying Ford's motion to suppress. We overrule Ford's sole issue.

## V.  CONCLUSION

Having overruled Ford's sole issue, we affirm the trial court's judgment.

SUE WALKER
JUSTICE

PANEL: DAUPHINOT, WALKER, and MCCOY, JJ.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED: January 22, 2009

15