**AFFIRMED as MODIFIED and Opinion Filed December 13, 2018**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

## No. 05-17-00422-CR

**DARRION DWAYNE DALLAS, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the 291st Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. F-1675403-U**

## MEMORANDUM OPINION

Before Justices Stoddart, Whitehill, and Boatright
Opinion by Justice Whitehill

A jury convicted appellant of Andre Davis's murder during the robbery of a "trap house," and after appellant pled true to an enhancement, the trial court sentenced him to life imprisonment.[1] In two issues, appellant now argues that (i) the non-accomplice evidence is insufficient to connect him to the offense, and (ii) the trial court erred in admitting unwarned statements he made to a detective during an interview. In a cross-point, the State requests that we modify the judgment to reflect that the court assessed punishment.

We conclude that the non-accomplice evidence is sufficient to link appellant to the offense because, excluding the accomplice testimony, the evidence showed, among other things, (i) a witness identified the accomplice as one of the men involved in the robbery and appellant admitted

---

[1] A "trap house" is a drug house.

that he was driving through the neighborhood with the accomplice during the same time frame that the crime was committed; (ii) appellant's cell phone was found in the trap house's front yard and phone records showed that the person using appellant's phone that night in the murder's vicinity was likely appellant; and (iii) appellant's aunt testified that appellant confessed to the shooting.

We further conclude that appellant was not in custody when he made the complained-of statement to the detective, and even if the interview later became custodial, appellant made no further statements of consequence. Therefore, the trial court did not err by admitting appellant's statement.

The record reflects that the court assessed punishment. We therefore modify the judgment to reflect this fact, and as modified, affirm.

## I. BACKGROUND

During the robbery of a trap house in which appellant was involved, Andre Davis (Dre) was shot twice in his legs, severing his arteries and causing his death.

Appellant's cousin, Kenneth Henderson, testified that appellant recruited him, along with Charles Jackson (Chuck D) to commit the robbery, and several witnesses saw appellant's car in the area of the murder.

Although he denied involvement in the crime, appellant admitted that he had driven through the area with Henderson that night. Appellant's phone was found in the trap house's front yard, and one of the men in the trap house identified Henderson as one of the robbers. Appellant's aunt, Frankie Davis, testified that appellant confessed to her that he was the shooter.

A jury found appellant guilty of murder. Appellant pled true to an enhancement paragraph in the indictment and the trial court sentenced him to life imprisonment. Appellant filed a motion for new trial, and timely filed this appeal.

II. ANALYSIS

A. **First Issue: Was the non-accomplice evidence sufficient to connect appellant to the offense?**

Appellant's first issue argues that Henderson's testimony was not sufficiently corroborated. As discussed below, we conclude that the non-accomplice testimony was sufficient to corroborate Henderson's accomplice testimony and to support the jury's determination that appellant was guilty of murder.

1. **Standard of Review and Applicable Law**

An accomplice is one who participated in the offense before, during, or after its commission with the requisite mental state. *Smith v. State*, 332 S.W.3d 425, 439 (Tex. Crim. App. 2011). A challenge to the sufficiency of the evidence corroborating accomplice testimony is not the same as a challenge to the sufficiency of the evidence supporting the verdict as a whole. *Cantelon v. State*, 85 S.W.3d 457, 460 (Tex. App.—Austin 2002, no pet.). To determine if the corroboration is sufficient, we eliminate all of the accomplice testimony from consideration and then examine the remaining record to see if any evidence tends to connect the accused with the commission of the offense. *Smith*, 332 S.W.3d at 439; *see* TEX. CODE CRIM. PROC. ANN. art. 38.14 (a conviction cannot stand upon accomplice testimony unless corroborated by other evidence that tends to connect the defendant with the offense). Corroboration is insufficient if it merely shows the offense was committed. TEX. CODE CRIM. PROC. ANN. art. 38.14; *Smith*, 332 S.W.3d at 439.

The corroborating evidence, however, need not be sufficient by itself to establish the defendant's guilt, and it may be direct or circumstantial evidence. *Smith*, 332 S.W.3d at 442. Moreover, the evidence may confirm a "mere detail" rather than the elements of the offense. *Lee v. State,* 29 S.W.3d 570, 577 (Tex. App.—Dallas 2000, no pet.). Thus, even "apparently insignificant incriminating circumstances" may provide sufficient corroboration. *Dowthitt v. State*, 931 S.W.2d 244, 249 (Tex. Crim. App. 1996).

–3–

Evidence that the defendant was in the accomplice's company at or near the time or place of the crime is proper corroborating evidence, but such evidence alone is not conclusive corroboration. *Hernandez v. State*, 939 S.W.2d 173, 178 (Tex. Crim. App. 1997). In addition, evidence of flight and guilty demeanor, coupled with other corroborating circumstances may tend to connect a defendant to a crime. *See Burks v. State*, 876 S.W.2d 877, 888 (Tex. Crim. App. 1994).

No precise rule can be formulated as to the amount of evidence that is required to corroborate an accomplice's testimony. *Dowthitt*, 931 S.W.2d at 249. Rather, we look at the particular facts and circumstances of each case and consider whether rational jurors could have found that the combined force of all the non-accomplice evidence tends to connect the accused to the offense. *See Smith*, 332 S.W.3d at 442.

### 2. The Accomplice Testimony

Henderson, the accomplice, testified that appellant was the mastermind of the robbery and was who shot Dre. Henderson also was charged with Dre's murder, but he had reached an agreement with the State to testify in exchange for a reduced charge of aggravated robbery with a twenty-year sentence.

According to Henderson, around midnight on October 8, 2015, appellant and Chuck D. came to his apartment complex on Ridgecrest in Dallas, Texas, where he was running a trap house. Appellant said, "Kinfolk, I got a lick, you want to go hit a lick with me [?]"

Then, Henderson, Chuck D., and appellant left the apartment to go commit a robbery against "some dude named West." Appellant drove them to the location of the planned robbery in his car; appellant took an SKS rifle and Chuck D. took a .38 revolver. The plan was for Chuck D. to go inside the house and distract any occupants by attempting to sell the revolver to them. While the occupants were distracted, Henderson and appellant were to rush in and rob the house.

Chuck D. went inside as planned, and Henderson and appellant waited in the car for a while. Then, Henderson then went to the door without a gun and knocked on it. Appellant got out of the car as Henderson entered the house.

When Dre answered the door, Henderson went inside and told Chuck D. to put the bullets back in the gun and leave. Dre stepped out the house's front door. As Chuck D. was trying to get the bullets, he dropped them on the floor and Henderson heard four gunshots. He determined that appellant was shooting Dre with "the long gun."

As Henderson exited the front door, he saw appellant standing over Dre with the gun, and Henderson asked appellant why he shot Dre. Appellant said, "he had to."

Henderson got into the back seat of the car, and appellant got in the driver's seat. Chuck D. came out of the house running and shooting, but he did not hit anyone. Chuck D. ran "straight to the store" and passed the car, so they had to stop and pick him up.

Henderson noticed a police car following them, but they were not stopped. Henderson took the SKS rifle back to his Ridgecrest apartment, then placed it in a small lake near his mother's apartment complex the following night.

### 3. The Non-Accomplice Evidence

We must now determine whether there is sufficient evidence without Henderson's testimony to connect appellant to the offense.

#### a. Identification of Henderson

Achiquan Carter a/k/a "Quan" testified that he and Joston Crenshaw a/k/a "JaJa" were in the trap house with Dre at around 3:00 on the morning of the shooting. Dre and JaJa were creating a song on a computer when "Chuck D." entered the house and attempted to sell a .38 special to them. Chuck D. emptied the bullets from the gun, telling the men that "the first thing you don't do, is buy a gun when it's loaded." As Chuck D. was showing the gun to them, someone knocked

on the door. When Dre opened the door to peek out, two men pushed through the door and started shooting. Two shots came through the door immediately; Dre "squared up at the door" and was hit by more bullets, while Quan and JaJa ran to the back of the house and jumped out the bathroom window. Quan recognized the first man through the door, but because it was dark outside and one of the men was in front of the other, he did not recognize the second one. Quan said that he saw the barrel of a gun and the first man had a gun. In a subsequent photo lineup, he identified Henderson as the first man at the door.

### b. Identification of Appellant's Car

Luther Farris, lived two houses down from the crime scene. He was awakened at 3:20 a.m. the morning of the murder by the sound of around four gunshots. When Farris went outside to investigate, he saw a white Crown Victoria turn the corner and about a minute later heard two more shots fired. Farris found Dre lying face down in the front yard, with blood gushing out of his body. He brushed the dirt out of Dre's face, tried to care for him, and called 911.

Michael Watson, a Ben E. Keith employee, had arrived at his early morning shift between 3:30 and 4:00 a.m. the morning of the murder. He was in the employee parking lot in the area when he heard gunshots. He saw a black male running down the middle of the street, and about five to eight seconds later, a light-colored Crown Victoria with chrome rims and possibly containing two people pulled up, picked up the pedestrian, and drove away at a high rate of speed. Ben E. Keith security camera footage of the street view near the building was admitted into evidence and showed a light-colored car with chrome rims driving on the street.

At 3:30 a.m., Isrrael Guerra, a detective with a nearby hospital, was standing outside the hospital when he heard four gunshots and saw a light colored car in the intersection. The officer did not notice anything out of the ordinary, so he continued conversing with a fellow officer.

–6–

About thirty seconds later, he heard two additional gunshots; he looked again and saw the car take off at a high rate of speed and travel toward the highway.

Detective Guerra got in his patrol car, followed the car, and recorded the pursuit with his in-car recording device, which the State played for the jury. The car Guerra was following ran a stoplight, and Guerra recalled thinking that appellant's driving was "super strange. But for safety reasons, he did not make a traffic stop.

Detective Steven David used the license plate number of the car from Detective Guerra's in-car recording and determined the silver, four-door 2003 Mercury was owned by Betty Dallas, Appellant's grandmother. Detective David testified that from a distance, this type of car tends to look like a Crown Victoria.

### c. Appellant's statements

Appellant's girlfriend drove him to the police station where he voluntarily spoke with Detective David. He said that he had a Grand Marquis that was his sister's car, owned by his grandmother, and his sister allowed him to drive it. Appellant said that he and his cousin had been driving through the neighborhood at the time of the murder because they were looking for an IHOP. He knew something was going on because he noticed "a hospital police car" "drive up on" them "real fast," but they were never pulled over, so they returned to the apartments where they were staying.

Detective David told appellant they found his cell phone at the murder scene, and appellant replied, "For real? . . . I don't know how my phone . . . I lost my phone though." Appellant said he did not know how the phone got there because he did not know anyone in that neighborhood.

### d. Appellant's cell phone

Investigating officers found appellant's cell phone near a large pool of blood at the base of the steps leading into the trap house. Appellant was identified as the phone's owner. A record of

all calls and text messages was admitted into evidence. One of the towers used by the phone that night was near the trap house.

A Dallas area map was admitted into evidence to demonstrate the locations of the cell towers and times used to place calls on the cell phone. The path of the cell's use, from the apartments where appellant said they started, to one near downtown Dallas, to the one in the area of the murder, matched appellant's account of driving from the apartments to the area of the crime scene.

Appellant's girlfriend's phone number was identified as one of the numbers called. The last outgoing call from appellant's phone on the night of the murder was at 2:24 a.m. and the last incoming call was at 2:31 a.m. In addition, a text to appellant's girlfriend included a picture of appellant, and photos "that would not be appropriate to show the jury" were texted back and forth between appellant's phone and another number between 1:42 a.m. and 1:44 a.m. Thus, Detective David concluded that appellant had not lost his phone several days before, and had possession of the phone until the time of the murder.

### e. Appellant's confession to his aunt

Frankie Davis, appellant's aunt said she knew that both Henderson and appellant were at the crime scene. Henderson had already been arrested. When Davis asked appellant to tell her the truth, she said he told her that "he shot that boy and Kenneth didn't have nothing to do with it." Davis believed that appellant was telling the truth.

### f. The jury charge

The jury was instructed to find appellant guilty of murder if the State proved he intentionally or knowingly caused Dre's death, or he intended to cause serious bodily injury and committed an act clearly dangerous to human life. *See* TEX. PENAL CODE ANN. § 19.02 (b)(1), (b)(2). The jury was also instructed under the law of the parties that they could find appellant

–8–

guilty as a party to the murder if the State proved he committed the murder by his own conduct, by the conduct of another for whom he was criminally responsible, or both. *See id.* §7.01(a). A person is criminally responsible for an offense committed by the conduct of another if, acting with the intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the person to commit the offense. *Id*. §7.02(a)(2).

### 4. Conclusion

Based on the foregoing, we conclude that the combined force of the non-accomplice evidence is sufficient to corroborate the accomplice witness testimony and to support the jury's guilty verdict. Rational jurors could have found that appellant's statements, the discovery of his cell phone at the scene, his cell phone records, the identification of Henderson, the identification of appellant's car, and appellant's confession to his aunt sufficiently connected appellant to the offense. We resolve appellant's first issue against him.

**B.      Second Issue:  Did the trial court err by admitting unwarned statements appellant made to a detective during his voluntary, pre-arrest interview?**

Five days after the murder, appellant voluntarily went to the police station and participated in a recorded interview with Detective David because appellant's mother told him the police wanted to talk to him about a murder. The trial court conducted a hearing on appellant's motion to suppress this recording and denied the motion, ruling that ". . . [B]ased on what I observed, I believe that [appellant] was free to go at any time. It was made apparent to him. He voluntarily gave his statement. He was not in custody." Thus, the recorded interview was admitted into evidence at trial.

Appellant's second issue argues that the circumstances surrounding the detective's questioning caused him, and would have caused a reasonable person, to feel that he was not free to terminate the questioning and leave the station. Accordingly, appellant maintains that he was

in custody, and because he was not given *Miranda* and article 38.22 warnings, the statement he gave should have been suppressed.[2]

Although there may have been a point in time where the noncustodial questioning evolved into custodial interrogation, the complained-of statement was made when appellant was not in custody. Therefore, the trial court properly admitted the statements.

### 1.      Standard of Review and Applicable Law

We review the denial of a motion to suppress for an abuse of discretion. *Guzman v. State,* 955 S.W.3d 85, 89 (Tex. Crim. App. 1997). When we review a trial court's determination about whether a person was in custody for *Miranda* purposes, we apply a bifurcated standard of review, giving almost total deference to the trial court's rulings on (i) questions of historical fact, even if the trial court's determination of those facts was not based on an evaluation of credibility and demeanor and (ii) application-of-law-to-fact questions that turn on an evaluation of credibility and demeanor. *See Amador v. State*, 221 S.W.3d 666, 673 (Tex. Crim. App. 2007). When application-of-law-to-fact questions do not turn on the credibility and demeanor of the witnesses, we review the trial court's ruling on those questions de novo. *See Amador,* 221 S.W.3d at 673.

*Miranda* warnings and article 38.22 requirements are mandatory only when police are conducting a custodial interrogation. *Herrera v. State*, 241 S.W.3d 520, 526 (Tex. Crim. App. 2007). Thus, a noncustodial, voluntary, oral statement is admissible at trial. TEX. CODE CRIM. PROC. art. 38.22, § 5.

The defendant bears the initial burden to prove that a statement was the product of custodial interrogation. *Id.* The State has no burden to show compliance with *Miranda* unless and until the

---

[2] Code of Criminal Procedure article 38.22 governs the admissibility of statements made by a defendant during custodial interrogation in a criminal proceeding. *See* TEX. CODE CRIM. PROC. art. 38.22. The determination of what constitutes "custody" is the same for purposes of article 38.22 as it is for *Miranda*. *Herrera v. State*, 241 S.W.3d 520, 526 (Tex. Crim. App. 2007).

record as a whole "clearly establishes" that the defendant's statement was the product of a custodial interrogation. *Id.*

"Custody" does not require a formal arrest. *Gregory v. State*, 56 S.W.3d 164, 174–75 (Tex. App.—Houston [14 Dist.] 2001, pet. dism'd). An individual is "in custody" for *Miranda* purposes if, under the circumstances, a reasonable person would believe his freedom of action was restricted to the level associated with a formal arrest. *Dowthitt*, 931 S.W.2d at 254.

A person may be in custody under any of these four general situations: (i) when the suspect is physically deprived of his freedom of action in any significant way; (ii) when a law enforcement officer tells the suspect that he cannot leave; (iii) when law enforcement officers create a situation that would lead a reasonable person to believe that his freedom of movement has been significantly restricted; and (iv) when there is probable cause to arrest and law enforcement officers do not tell the suspect that he is free to leave. *Id*. "The first three situations require that the restriction on a suspect's freedom of movement must reach 'the degree associated with an arrest' instead of an investigative detention." *State v. Saenz*, 411 S.W.3d 488, 496 (Tex. Crim. App. 2013).

## 2. Analysis

The recording begins with Detective David greeting appellant. And before the detective asks a single question, appellant begins telling his story about being in the neighborhood of the murder because he was looking for an IHOP. David interrupts him to get appellant's personal information.

Then, David asked appellant about his car and where he was on the day of the murder and the day before, and appellant explained that he drove a Grand Marquis, his sister's car that his grandmother owns.

Appellant said he had been "chillin and rinking" with friends in an apartment complex near Walton Walker when, at around 1:00 a.m., he and Henderson decided to go to an IHOP. But he

–11–

took a wrong turn and was lost, which is why they were in the crime scene neighborhood. Appellant said he drove "up this certain street" and noticed "some things happened in the back, like up this street" because a police car drove up rapidly and followed them. Appellant denied that he ever pulled up to a house in the neighborhood, stating that he did not know anyone in the neighborhood. According to appellant, he and Henderson were the only ones in the car.

When asked about whether he had a phone with him that night, appellant said, "I think so? Nah. I don't know." Detective David told appellant his cell phone had been found in the front yard of the house where the murder occurred, and confronted appellant about saying he did not have a phone. Appellant said, "Nah, I say I got a phone. I lost it." Although he did not know when and where he lost his phone, appellant said, "In the process of me losing my phone, I did not lose it right there." When Detective David then said that appellant had come to the station voluntarily, appellant replied, "Yes, sir, we gonna talk."

About twenty-seven minutes into the interview, appellant said, "I usually woulda come with a lawyer, but in my mind I'm not thinking we're gonna get this deep." Detective David responded that appellant was not under arrest and was free to walk out of the station. Appellant says he will come back the next day with a lawyer, and when David asks why a lawyer, appellant replies, "Because it's like, I can't talk to you how I would really like to because it can be incriminating and at the same time I'm telling you, look, man, we just rode through there." Appellant concluded the interview saying that he had not done anything and would "leave it at that, and we're gonna fix it tomorrow." David says, "Okay . . . just sit tight for one second" and walks out of the room.

Appellant is left alone in the room for about twenty-two more minutes and tries the door a couple of times, but it is locked. When David returns to ask more questions, appellant asks if they can be answered the next day with his lawyer. David replies "That's fine."

–12–

There is some discussion about David obtaining a warrant for appellant's residence, and David asks appellant where he went after he left the neighborhood of the murder. Appellant responds that he went back to the Ridgecrest apartments and spent the night. Appellant then stands up, says he will come back with a lawyer, and asks David to let him go.

Appellant is left alone for nine more minutes. He knocks on the door several times, and at one point, can be heard yelling, "Shut up, Brittani."[3] Appellant knocks some more and asks to speak to Brittany when the door is opened. Someone can be heard telling appellant they are not done speaking with Brittani and to step back inside the room. When appellant asks to leave again, the door is opened and someone says, "If you want to go, go."

Detective David testified that appellant was not under arrest when he came to the station and David did not read him his *Miranda* rights. He said that appellant could have stopped answering questions at any time. Appellant was free to leave, although David did not tell him that until about twenty minutes into the interview. Appellant never asked for an attorney and when he said he would return with one the next day, David told him that was fine.

David said the interrogation room was not locked while he was in there, but rooms are always locked when an officer leaves so no one just wanders the halls. David also said he did not have sufficient probable cause to arrest appellant at the time of the interview and appellant left the station on his own volition.

Appellant also testified at the suppression hearing. He acknowledged that he went to the station voluntarily, on his own terms, and was never under arrest. But he said he did not feel he had the right to leave the room or stop answering questions. He wanted to leave, but the detective used an "aggressive manner," physically blocked him with his body, and then closed the door and locked it. It is well-established that simply because an interrogation begins as "noncustodial" does

---

[3] Brittani is appellant's girlfriend. She drove him to the police station and was talking to the police while appellant was being interviewed.

–13–

not preclude custody from arising later if law enforcement officers' conduct causes "a consensual inquiry to escalate into [a] custodial interrogation." *Dowthitt*, 931 S.W.2d at 255. But here, we need not determine whether this occurred because the incriminating statements appellant made were well before the first time the encounter arguably became custodial (when appellant tried to leave the room and found the door was locked).[4]

As appellant admitted, he voluntarily came to the police station to be interviewed. *See California v. Beheler*, 463 U.S. 1121, 1122–25 (1983) (per curiam) (defendant was not in custody when he voluntarily came to police station, gave a statement after brief questioning, and then was allowed to return home); *Oregon v. Mathiason*, 429 U.S. 492, 493–95 (1977) (per curiam) (suspect who voluntarily came to police station, was immediately informed that he was not under arrest, participated in a short interview, and left the police station without hindrance was not in custody). When David confirmed that appellant was there voluntarily, appellant said, "Yes, sir, we gonna talk." The door was not locked while the detective was in the room and appellant acknowledged that he was never under arrest. Appellant was informed that he was free to leave, and David said he did not have sufficient probable cause to arrest appellant at the time of the interview.

Moreover, even if appellant was in custody, he volunteered that he and Henderson were in the neighborhood of the murder before he was asked the first question. *See Carter v. State*, No. 01-17-00159-CR, 2018 WL 5259895, at *3 (Tex. App.—Houston [1st Dist.] 2018, no pet.) (mem. op., not designated for publication) (voluntary statement that was not made in response to questioning or any words or actions officers should have known were reasonably likely to elicit incriminating response did not require warnings); *Rhode Island v. Innis*, 446 U.S. 291, 299–300

---

[4] Appellant does not specify which of the information he relayed or comments he made were allegedly incriminating. But nothing of substance was discussed after the first time the detective left the room.

–14–

(1980) (even when defendant was in custody, *Miranda* did not prohibit voluntary statement that was not made in response to a question by police).

After thoroughly reviewing appellant's recorded statement, we conclude that appellant did not meet his burden to establish that his incriminating statements were the product of an unwarned custodial interrogation and not given voluntarily. Because appellant's statement did not stem from "custodial interrogation," the lack of *Miranda* and article 38.22 warnings did not require the suppression of his statement. Accordingly, the trial court did not abuse its discretion by denying the motion to suppress on this basis.

## C.    Cross-point:  Should the judgment be reformed?

The State requests that we modify the judgement to reflect that the court, rather than the jury, assessed punishment. We are authorized to reform a judgment to make the record speak the truth when we have the necessary information to do so. *Bigley v. State*, 865 S.W.2d 26, 27 (Tex. Crim. App. 1993).

Here, the record reflects that the court assessed punishment. We therefore sustain the State's cross-point and modify the judgment accordingly.

### III.  CONCLUSION

We resolve appellant's issues against him, modify the judgment, and as modified, affirm.


/Bill Whitehill/
BILL WHITEHILL
JUSTICE


Do Not Publish
TEX. R. CIV. P. 47
170422F.U05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

DARRION DWAYNE DALLAS,
Appellant

No. 05-17-00422-CR     V.

THE STATE OF TEXAS, Appellee

On Appeal from the 291st Judicial District
Court, Dallas County, Texas
Trial Court Cause No. F-1675403-U.
Opinion delivered by Justice Whitehill.
Justices Stoddart and Boatright
participating.

Based on the Court's opinion of this date, the judgment of the trial court is **MODIFIED** to reflect that the jury assessed punishment and as modified, is **AFFIRMED**.

Judgment entered December 13, 2018.